NOT YET SCHEDULED FOR ORAL ARGUMENT

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

**No. 24-5172**

---

MONTE ROSE, JR., *et al.*,
*Plaintiffs-Appellees*,

v.

ROBERT F. KENNEDY, JR., Secretary of Health and Human Services, *et al.*,
*Defendants-Appellees*,

and

INDIANA FAMILY AND SOCIAL SERVICES ADMINISTRATION,
*Intervenor-Appellant.*

---

**OPENING BRIEF OF INTERVENOR-APPELLANT**

---

THEODORE E. ROKITA
Attorney General of Indiana

JAMES A. BARTA
Solicitor General

JENNA M. LORENCE
Deputy Solicitor General

CAROLINE M. BROWN

Brown & Peisch PLLC
1225 19th St. NW, Suite 700
Washington, D.C. 20036
(202) 499-4258
cbrown@brownandpeisch.com

Office of the Attorney General
IGC South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204
(317) 232-0709
James.Barta@atg.in.gov

*Counsel for Intervenor-Appellant*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A.    Parties and Amici

*Intervenor-Appellant* is Indiana Family and Social Services Administration.

*Plaintiffs-Appellees* are Monte Rose, Jr; Chelsey Lang; and Emily Rames.

*Defendants-Appellees* are Robert F. Kennedy, Jr., Secretary, United States Department of Health and Human Services, in his official capacity; Stephanie Carlton, Acting Administrator, Centers for Medicare and Medicaid Services, in her official capacity; the United States Department of Health and Human Services; and Centers for Medicare & Medicaid Services.

There are currently no additional intervenors or amici.

### B.    Rulings Under Review

The rulings under review are the opinion and final judgment issued under Rule 54(b) entered on June 27, 2024, D67; D68; *see* D71, and all

i

prior orders and decisions that merge into those. The rulings were issued by the Honorable James E. Boasberg in Case No. 1:19-cv-02848 (D.D.C.).

**C.    Related Cases**

There are no related cases within the meaning of Circuit Rule 28(a)(1)(C).

ii

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ................................................................. i

TABLE OF CONTENTS ..................................................... iii

TABLE OF AUTHORITIES ................................................ vi

GLOSSARY .......................................................................... xiv

INTRODUCTION ................................................................... 1

JURISDICTIONAL STATEMENT ........................................ 3

STATEMENT OF THE ISSUES ............................................ 4

STATUTES AND REGULATIONS ....................................... 5

STATEMENT OF THE CASE .............................................. 5

SUMMARY OF ARGUMENT ............................................. 23

STANDARD OF REVIEW .................................................. 25

ARGUMENT ........................................................................ 26

I.    The 2020 Approval—Which Underpins Indiana's Expansion of Medicaid Coverage and Benefits—Is Consistent with Medicaid's Objectives and Reasoned Decisionmaking ................. 26

      A.    Section 1115 gives the Secretary broad discretion to approve demonstrations ........................................ 28

      B.    The Secretary rationally concluded that the waiver would enhance coverage for needy populations ................. 30

iii

1.    The waiver allows Indiana to expand
      Medicaid and provide optional benefits........................31

2.    The district court adopted the wrong baseline............32

3.    The district court improperly second-guessed
      the Secretary's weighing of evidence...........................37

C.    The Secretary rationally concluded a waiver would
      promote sustained coverage....................................................41

1.    HIP promotes sustainability by improving
      beneficiary health, finding efficiencies, and
      preparing beneficiaries for commercial coverage........42

2.    The district court misapprehended how the
      waiver promotes sustainability ...................................44

II.   The District Court Erred in Vacating the Approval, Which
      Undergirds Medicaid Benefits for Hundreds of Thousands..........48

A.    Plaintiffs lack standing to seek vacatur ................................48

1.    Rames lacks standing ...................................................49

2.    The other plaintiffs lack standing ...............................54

B.    Any remand should have been without vacatur .................57

1.    Any deficiencies in the Secretary's reasoning can
      be rehabilitated on remand..........................................58

2.    Vacatur is highly disruptive ........................................60

III.  This Court Has Appellate Jurisdiction...........................................63

A.    The Rule 54(b) judgment is final and appealable ...............63

iv

B.     Practical considerations reinforce that the judgment is
       final and appealable.............................................................. 65

CONCLUSION ......................................................................... 69

v

# TABLE OF AUTHORITIES

### CASES

*Aguayo v. Richardson*,
    473 F.2d 1090 (2d Cir. 1973) ....................................................... 28, 29

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
    988 F.2d 146 (D.C. Cir. 1993) ............................................................ 58

*Am. Council of Blind v. Mnuchin*,
    977 F.3d 1 (D.C. Cir. 2020) ............................................................... 46

*Am. Fuel & Petrochemical Mfrs. v. EPA*,
    937 F.3d 559 (D.C. Cir. 2019) ............................................................ 46

*\*Am. Great Lakes Ports Ass'n v Schultz*,
    962 F.3d 510 (D.C. Cir. 2020) ................................................... 67, 68, 69

*Armstrong v. Exceptional Child Cntr., Inc.*,
    575 U.S. 320 (2015) ....................................................................... 69

*Attias v. Carefirst, Inc*,
    969 F.3d 412 (D.C. Cir. 2020) ..................................................... 63, 64

*Azar v. Gresham*,
    141 S. Ct. 890 (2020) ................................................................ 17, 59

*Becerra v. Gresham*,
    142 S. Ct. 1665 (2022) .......................................................... 17, 36, 37

*Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc.*,
    419 U.S. 281 (1974) ....................................................................... 30

*C.K. v. N.J. Dep't of Health & Hum. Servs.*,
    92 F.3d 171 (3d Cir. 1996) ............................................................... 29

*Chamber of Com. v. SEC*,
    443 F.3d 890 (D.C. Cir. 2006) ............................................................ 57

vi

## CASES [CONT'D]

*Dep't of Educ. v. Brown,*
  600 U.S. 551 (2023) ............................................................................ 48

*Dickinson v. Petroleum Conversion Corp.,*
  338 U.S. 507, 511 (1950) .................................................................. 65

*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009) .................................................................... 28, 39

*FCC v. Prometheus Radio Project,*
  592 U.S. 414 (2021) ............................................................ 29, 38, 47

*FEC v. Atkins,*
  524 U.S. 11 (1998) ............................................................................ 54

*Georgia v. Brooks-LaSure,*
  2022 WL 3581859 (S.D. Ga. Aug. 19, 2022) .......................... 33, 34, 66

*Gillespie v. U.S. Steel Corp.,*
  379 U.S. 148 (1964) .......................................................................... 65

*Gresham v. Azar,*
  363 F. Supp. 3d 165 (D.D.C. 2019) .................................................. 36

*Kucana v. Holder,*
  558 U.S. 233 (2010) .......................................................................... 33

*Lakes Pilots Ass'n, Inc. v. U.S. Coast Guard,*
  359 F.3d 624 (D.C. Cir. 2004) .......................................................... 68

*Limnia, Inc. v. U.S. Dep't of Energy,*
  857 F.3d 379 (D.C. Cir. 2017) .................................................... 67, 68

*Lindeen v. SEC,*
  825 F.3d 646 (D.C. Cir. 2016) .......................................................... 39

*In re Long Distance Tel. Serv. Fed. Excise Tax Refund Litig.,*
  751 F.3d 629 (D.C. Cir. 2014) .......................................................... 67

vii

## CASES [CONT'D]

*Lujan v. Defs. of Wildlife,*
 504 U.S. 555 (1992).................................................................56

*Luna Perez v. Sturgis Pub. Sch.,*
 598 U.S. 142 (2023)...............................................................44

*Massachusetts v. EPA,*
 549 U.S. 497 (2007)...............................................................69

*\*Nat'l Fed'n of Indep. Bus. (NFIB) v. Sebelius,*
 567 U.S. 519 (2012)........................................... 9, 31, 36, 41

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,*
 524 F.3d 917 (9th Cir. 2008)...............................................65

*Nazareth Hosp. v. Sec'y U.S. Dep't of Health & Hum. Servs.,*
 747 F.3d 172 (3d Cir. 2014) ................................................28

*Petro-Chem Processing, Inc. v. EPA,*
 866 F.3d 433 (D.C. Cir. 1989)............................................55

*Pharm. Rsch. & Mfrs. Am. v. Thompson,*
 362 F.3d 817 (D.C. Cir. 2004).............................................29

*Philbrick v. Azar,*
 397 F. Supp. 3d 11 (D.D.C. 2019) ................................37, 62

*PPG Indus., Inc. v. United States,*
 52 F.3d 363 (D.C. Cir. 1995)...............................................66

*Radio-Television News Directors Ass'n v. FCC,*
 184 F.3d 872 (D.C. Cir. 1999) ............................................58

*Schaerr v. U.S. Dep't of Just.,*
 No. 20-5065, 2020 WL 5642042 (D.C. Cir. July 8, 2020) ..................64

*Shands Jacksonville Med. Ctr., Inc. v. Azar,*
 959 F.3d 1113 (D.C. Cir. 2020)...........................................58

viii

CASES [CONT'D]

*St. Marks Place Hous. Co. v. U.S. Dep't of Hous. & Urban Dev.*,
610 F.3d 75 (D.C. Cir. 2010) .................................................................. 63

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
985 F.3d 1032 (D.C. Cir. 2021) ........................................................... 26

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998) .................................................................................. 54

*Stewart v. Azar*,
313 F. Supp. 3d 237 (D.D.C. 2018) ..................................................... 53

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) ............................................................................... 54

*Thompson v. District of Columbia*,
832 F.3d 339 (D.C. Cir. 2016) ......................................... 25, 26, 42, 45

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ............................................................................... 48

*Travis v Sullivan*,
985 F.2d 919 (7th Cir. 1993) ......................................................... 66, 68

*Union of Concerned Scientists v. U.S. Dep't of Energy*,
998 F.3d 926 (2021) .............................................................................. 57

*Univ. Medical Cntr. of S. Nev. v. Shalala*,
173 F.3d 438 (D.C. Cir. 1999) ............................................................. 54

*Watkins Law & Advoc., PLLC v. U.S. Dep't of Veterans Affs.*,
No. 19-5341, 2020 WL 3002126 (D.C. Cir. Mar. 12, 2020) ............... 64

*Webster v. Doe*,
486 U.S. 592 (1988) ............................................................................... 28

*Wilder v. Virginia Hosp. Ass'n*,
496 U.S. 498 (1990) ................................................................................. 5

ix

STATUTES

5 U.S.C. § 702 ................................................................................ 3

28 U.S.C. § 1291 ....................................................................... 4, 63

28 U.S.C. § 1331 ............................................................................ 3

28 U.S.C. § 1391(e)(1) .................................................................. 66

42 U.S.C. § 1315 .......................................................................... 17

*42 U.S.C. § 1315(a) ........................... 1, 4, 6, 23, 27, 28, 33, 35, 39, 40, 47

42 U.S.C. § 1315(a)(1) .................................................................. 34

*42 U.S.C. § 1315(d) ............................................................... 29, 39

*42 U.S.C. § 1315(d)(1) ........................................................... 34, 45

42 U.S.C. § 1396-1 ....................................................................... 42

42 U.S.C. § 1396. ........................................................................... 5

42 U.S.C. § 1396a(a) ...................................................................... 5

42 U.S.C. § 1396a(a)(4) .................................................................. 6

42 U.S.C. § 1396a(a)(10)(A)(i)(VIII) .............................................. 9

42 U.S.C. § 1396a(a)(14) ................................................................ 5

42 U.S.C. § 1396a(a)(22) .......................................................... 29, 41

42 U.S.C. § 1396a(a)(30)(A) ...................................................... 29, 41

42 U.S.C. § 1396a(a)(33)(A) ...................................................... 29, 41

42 U.S.C. § 1396a(a)(34) ................................................................ 5

42 U.S.C. § 1396a(b) ...................................................................... 5

42 U.S.C. § 1396a(k) ................................................................ 29, 41

x

## STATUTES [CONT'D]

42 U.S.C. § 1396a(k)(1) ........................................................ 9

42 U.S.C. § 1396d(a)(13) ................................................ 29, 41

42 U.S.C. § 1396*o*(a)(3) ......................................................... 6

42 U.S.C. § 1396*o*(b)(3) ......................................................... 6

42 U.S.C. § 1396u-7(1) ........................................................ 9

42 U.S.C. § 1396u-7(b) .................................................. 29, 41

42 U.S.C. § 1396u-7(b)(2) .............................................. 31, 51

Families First Coronavirus Response Act, Pub. L. 116-127,
    § 6008(b)(2)–(3), 134 Stat. 178, 208 (2020) .................. 15, 50

Ind. Code § 12-8-1.5-7.5 ..................................................... 15

Ind. Code § 12-15-44.5-3 ..................................................... 10

Ind. Code § 12-15-44.5-10(a) ...................................... 32, 49, 50

Ind. Code § 12-15-44.5-10(b) ............................................... 49

Ind. Code § 12-15-44.10(b)(8) .............................................. 32

Ind. House Enrolled Act No. 1678 (2007) ................................. 7

## RULES

Sup. Ct. R. 10 ................................................................... 59

## REGULATIONS

42 C.F.R. § 431.53 .............................................................. 6

42 C.F.R. § 431.408 ............................................................ 62

42 C.F.R. § 431.412(c) ........................................................ 62

42 C.F.R. § 431.416(b)–(d) ................................................... 62

xi

Regulations [Cont'd]

42 C.F.R. § 431.416(f) ................................................................. 61

42 C.F.R. § 447.52 ..................................................................... 6

*42 C.F.R. § 447.52(a) ................................................... 31, 38, 39

*42 C.F.R. § 447.52(b) ............................................. 31, 38, 39, 55

42 C.F.R. § 447.52(b)(1) .............................................................. 56

*42 C.F.R. § 447.52(e) ................................................... 31, 38, 39

Other Authorities

C. Wright & A. Miller, *Federal Practice and Procedure*
    § 3914.32 (2d ed.) ............................................................. 64

CMS, *CMS and Indiana Reach Agreement on Medicaid
    Expansion* (Jan. 27, 2015),
    https://www.cms.gov/newsroom/press-releases/cms-and-
    indiana-agree-medicaid-expansion ..................................... 12

CMS, *State Waivers List,*
    https://www.medicaid.gov/medicaid/section-1115-
    demo/demonstration-and-waiver-list/index.html ................. 6

*Healthy Indiana Plan Successes* (2013),
    https://perma.cc/A4SF-M5KG ............................................ 8

HIP, Indiana Register, Office of the Secretary of Family and
    Social Services, Indiana Medicaid (Feb. 13, 2015),
    https://www.in.gov/fssa/hip/files/HIPSPAPublicNotice
    1.pdf .................................................................................. 52

*Indiana Medicaid State Plan, *Alternative Benefit Plan
    Populations (HIP Basic),* https://perma.cc/M37H-YU9G ............. 52, 53

*Indiana Medicaid State Plan, *Alternative Benefit Plan
    Populations (HIP Plus),* https://perma.cc/SE3T-BEFE ............... 13, 53

## OTHER AUTHORITIES [CONT'D]

Indiana Medicaid State Plan, *Benefits Assurances (HIP Basic)* https://perma.cc/JMV5-VTDN ...............................................53

Indiana Medicaid State Plan, *Benefits Assurances (HIP Plus),* https://perma.cc/T7JU-RZ5C....................................................53

Indiana Medicaid State Plan, *Medicaid Premiums and Cost Sharing*, https://perma.cc/F5UK-WDK3 .............................................55

Letter from Gov. Pence to President Obama, (Oct. 2, 2014), https://perma.cc/V3ET-Y95M .............................................................11

Letter from Gov. Pence to Sec'y Sebelius, HHS (Feb. 13, 2013), https://perma.cc/FLM7-D4YD...................................................11

Letter from Gov. Pence to Sec'y Sebelius, HHS, (Nov. 15, 2013), https://perma.cc/PH64-XV7W......................................................11

Letter from Michael Gargano, FSSA, to Cindy Mann, CMS, (July 25, 2012), https://perma.cc/BG99-N7NV ...................................10

Lewin Group, *Indiana HIP 2.0: Evaluation of Non-Emergency Medical Transportation (NEMT) Waiver* 42 (2016), https://perma.cc/DLZ8-VZH3 .................................................14

*Prior Claims Payment Program Report* (2015), https://perma.cc/9E6J-YQPD.................................................................14

xiii

## GLOSSARY

| | |
|---|---|
| CMS | Centers for Medicare & Medicaid Services |
| HHS | U.S. Department of Health and Human Services Human Services |
| HIP | Healthy Indiana Plan |
| POWER account | Personal Wellness and Responsibility account |
| The Act | The Social Security Act |
| The Secretary | Secretary of the U.S. Department of Health and Human Services Human Services |

xiv

## INTRODUCTION

In 2015, Indiana struck a deal with the federal government to expand Medicaid through an innovative, consumer-driven program known as the Healthy Indiana Plan (HIP). Wildly popular among beneficiaries, HIP empowers them to take ownership of their health. Beneficiaries who make modest, monthly contributions—as low as $1 per month—to health-savings-like accounts obtain benefits beyond what Medicaid otherwise provides and are exempt from unpredictable time-of-service copayments that would otherwise be required. Beneficiaries have described HIP as, "by far, the best health insurance experience of [their] adult life" and "a model for the whole nation." SAR7150–51.

As part of the deal struck with Indiana, the Secretary of Health and Human Services waived certain Medicaid requirements under Section 1115 of the Social Security Act. That provision authorizes the Secretary to waive requirements for state projects that, "in [his] judgment," are "likely to assist in promoting the objectives" of Medicaid. 42 U.S.C. § 1315(a). When renewing the waiver, the Secretary reasoned that it would promote Medicaid's objective of "expanding the scope of coverage." SAR1555. A waiver would "help Indiana to continue to cover

1

non-mandatory benefits and eligibility groups," in part by improving beneficiaries' health, preparing them for commercial coverage, and achieving efficiencies. SAR1562; *see* SAR1555–57, 1561–66, 1570–72.

Although the Secretary cited evidence of HIP's successes, the district court vacated the waiver undergirding HIP. Notably, the court did not dispute that HIP provided more coverage for the Medicaid expansion population than what preceded the project (nothing). Instead, the court dismissed that consideration as irrelevant, asserting that the Secretary was required to assume Indiana had expanded Medicaid with no waivers and evaluate HIP against that hypothetical universe. But neither law nor logic requires the assumption the court demanded. Section 1115 makes Medicaid's overall "objectives" the standard for evaluating projects, not hypothetical alternatives.

Regardless, the Secretary could rationally conclude HIP would sustain Indiana's efforts to expand Medicaid and provide enhanced benefits. In invaliding the waiver, the court focused almost entirely on the possibility that a few features might prevent some Hoosiers from maintaining Medicaid coverage. But the Secretary acknowledged those concerns, considered Indiana's contrary evidence, and determined that

2

HIP would still promote coverage overall. Reasoned decisionmaking required him to do no more. The court erred in vacating the waiver.

## JURISDICTIONAL STATEMENT

On September 23, 2019, plaintiffs filed this lawsuit challenging the Secretary of Health and Human Services' (the Secretary) 2018 approval of the Healthy Indiana Plan 2.0 (HIP). D1.[1] After the Secretary issued a new approval in 2020, plaintiffs amended their complaint to challenge that approval, and the Secretary's 2023 decision not to rescind that approval. D32; D50-1. Although the case presents federal questions under 28 U.S.C. § 1331 and seeks review of agency action under 5 U.S.C. § 702, the district court lacked jurisdiction to consider the 2020 approval for the reasons below, *see* pp. 48–57, *infra*.

The federal defendants and plaintiffs filed dispositive motions. D54; D55; D57. On June 27, 2024, the district court granted plaintiffs' motion for summary judgment on Count I of their complaint, vacating and

---

[1] The parties are using a deferred appendix. Citations in the format "D1_1" refer to docket entries by docket number and, where applicable, page number; citations in the format "AR1" or "SAR1" refer to pages of the administrative record and supplemental administrative record, respectively. Those citations will be replaced with citations to the deferred appendix in the final briefs.

3

remanding the Secretary's 2020 approval. D67. Thereafter, on July 3, 2024, Indiana moved for entry of partial final judgment under Federal Rule of Civil Procedure 54(b). D69. The district court granted the motion in part and denied it in part on July 10, 2024. It clarified that its summary judgment order was final and "may currently be appealed," but "to allay [any] concern," it certified the order under Rule 54(b). D71_1.

Indiana filed a timely notice of appeal on July 12, 2024. D72. As explained further below, pp. 63–69, *infra*, this Court has appellate jurisdiction under 28 U.S.C. § 1291 because this appeal arises from a partial final judgment certified under Rule 54(b).

## STATEMENT OF THE ISSUES

1.     Whether the Secretary reasonably determined that the 2020 approval—which allows Indiana to operate a program that expands Medicaid and provides non-mandatory benefits—was "likely to assist in promoting the objectives" of Medicaid, 42 U.S.C. § 1315(a).

2.     Whether plaintiffs had standing to seek vacatur of the approval—which provides plaintiffs benefits that they wish to retain—and if so, whether the district court erred in vacating the approval rather than remanding without vacatur.

4

3.      Whether this Court has jurisdiction to hear Indiana's appeal of a partial final judgment under Rule 54(b) that removes authorities necessary for Indiana's Medicaid demonstration project.

## STATUTES AND REGULATIONS

See attached addendum as permitted by Circuit Rule 28(a)(1)(C)(5).

## STATEMENT OF THE CASE

### I.    Statutory Background

Since its adoption in 1965, Title XIX of the Social Security Act, popularly known as Medicaid, has offered federal funding to assist States in providing healthcare for needy populations. *See* 42 U.S.C. § 1396 *et seq*. To receive this funding, States must submit a plan for approval to the Centers for Medicare & Medicaid Services (CMS), acting for the Secretary of Health and Human Services (HHS). 42 U.S.C. § 1396a(b); *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 502 (1990).

Generally, state plans must meet the requirements of Section 1902 of the Act. 42 U.S.C. § 1396a(a). Those provisions include requirements concerning "enrollment fees, premiums, or similar charges," § 1396a(a)(14); the coverage of certain "care and services . . . furnished in or after the third month" before an individual applied for medical assistance (also called "retroactive eligibility"), § 1396a(a)(34); and

5

compliance with methods that the Secretary deems "necessary for the proper and efficient operation of the plan," § 1396a(a)(4). One of those methods is a requirement to offer state "assurance" of non-emergency transportation for medical appointments. 42 C.F.R. § 431.53. Medicaid permits States to include provisions for cost-sharing and deductions. *See* 42 U.S.C. § 1396*o*(a)(3), (b)(3); 42 C.F.R. § 447.52.

To give States greater flexibility, Section 1115 of the Act authorizes the Secretary to "waive compliance with any of the requirements of section . . . 1902." 42 U.S.C. § 1315(a). The Secretary may waive those requirements "to the extent and for the period he finds necessary" for "any experimental, pilot, or demonstration project which, in the judgment of the Secretary, is likely to assist in promoting the objectives of" Title XIX. *Id.* Nearly every State has a demonstration project. *See* CMS, *State Waivers List*, https://www.medicaid.gov/medicaid/section-1115-demo/demonstration-and-waiver-list/index.html.

## II.    History of the Healthy Indiana Plan

Indiana has operated a Section 1115 demonstration project, known as the Healthy Indiana Plan (HIP), since 2008. Although the project's

6

details have changed over time, the elements relevant here have been part of HIP since its inception.

## A.    HIP's initial incarnation

HIP originated in 2007 when the Indiana legislature authorized the Indiana Family and Social Services Administration to develop a health coverage program for uninsured adult Hoosiers who were aged 17 to 64, with a household income below 200% of the federal poverty level, and who were not otherwise eligible for Medicaid. *See* Ind. House Enrolled Act No. 1678 (2007) (codified at Ind. Code § 12-15-44.2). To promote personal responsibility and empower enrollees, HIP was designed to imitate features of commercial insurance. D50-1_44. Central to HIP's design are Personal Wellness and Responsibility (POWER) accounts. D32-2_11, 21. Modeled after a "Health Savings Account," POWER accounts are used to pay for healthcare expenses until a deductible is met—at which point state coverage takes over. *Id.*

In HIP's first incarnation, beneficiaries were required to make contributions to POWER accounts in an amount determined by family size and income. D32-2_11, 21. The State contributed any funds necessary to equal the deductible, making the State responsible for

7

nearly all POWER account contributions. D32-2_23. To encourage proactive health management, HIP allowed enrollees to offset their required contributions by rolling over unused funds and obtaining preventive care. D32-2_21. HIP did not provide retroactive coverage or non-emergency transportation. D50-1_64–65, 68. To accommodate these and other HIP features, the Secretary granted Indiana a Section 1115 waiver for a four-year period. D50-1_49–57, 95–96.

HIP was a success. The program's design generated greater patient engagement with health providers, higher use of preventative services, lower emergency-department usage, and higher use of cost-effective generic drugs. *Healthy Indiana Plan Successes* (2013), https://perma.cc/ A4SF-M5KG. According to a 2013 survey, 96% of beneficiaries were somewhat or very satisfied with their experience. *Id.* Most beneficiaries (83%) reported that they preferred making fixed monthly contributions to POWER accounts as opposed to unpredictable time-of-service copayments. *Id.* And more than 93% reported that they would be willing to make larger contributions for enhanced coverage. *Id.*

8

## B.    Indiana negotiates over Medicaid expansion

In 2010, Congress enacted the Affordable Care Act, Pub. L. 111-148, which required state Medicaid programs to cover a new population consisting of adults under age 65 with incomes below 133% of the federal poverty level. *See* 42 U.S.C. § 1396a(a)(10)(A)(i)(VIII). That group included portions of the HIP population. In requiring States to expand Medicaid, however, Congress did not require States to provide the expansion population with the same level of coverage as other beneficiaries. Rather, Congress required States to provide only "benchmark" benefits for essential services. §§ 1396a(k)(1), 1396u-7(1).

Twenty-seven States, including Indiana, challenged the Medicaid expansion requirement. *Nat'l Fed'n of Indep. Bus. (NFIB) v. Sebelius,* 567 U.S. 519, 587–88 (2012) (opinion of Roberts, C.J., joined by Breyer and Kagan, JJ.). The Supreme Court held the expansion requirement unconstitutional, explaining that the federal government could not "withdraw existing Medicaid funds for failure to comply with the requirements set out in the expansion." *Id.* at 585. "States must have a genuine choice" as to whether to expand Medicaid. *Id.* at 588.

9

In response, CMS issued guidance explaining that States "may choose whether and when to expand [coverage for low-income individuals], and, if a state covers the expansion group, it may decide later to drop the coverage." AR314–15. To entice States to expand Medicaid, CMS emphasized that "states have considerable flexibility under the law to design benefits for the new adult group and to impose cost-sharing." AR318; *see id.* ("states have considerable flexibility regarding coverage" and "significant" flexibility regarding "cost-sharing"). And CMS "invite[d] states" to develop programs that "promote value and individual ownership in health care decisions as well as accountability tied to improvement in health outcomes." *Id.*

Indiana took the federal government at its word. On a bipartisan basis, the Indiana legislature authorized the State to expand Medicaid through HIP. Ind. P.L. 213-2015, § 136 (codified at Ind. Code § 12-15-44.5-3). And through every stage of discussions with the federal government, Indiana made clear that it would only expand Medicaid "using the HIP program." Letter from Michael Gargano, FSSA, to Cindy Mann, CMS, at 1 (July 25, 2012), https://perma.cc/BG99-N7NV.

10

For example, in 2013, then-Governor Mike Pence informed HHS that "our administration will not pursue an expansion of traditional Medicaid" and "would predicate any expansion of Medicaid in Indiana on our ability to promote Hoosier innovation in the Healthy Indiana Plan." Letter from Gov. Pence to Sec'y Sebelius, HHS, at 1–2 (Feb. 13, 2013), https://perma.cc/FLM7-D4YD.

Later, the Governor again emphasized that it would be "essential" for the State to "maintain the consumer-driven model on which the [HIP] program is predicated" in any expansion. Letter from Gov. Pence to Sec'y Sebelius, HHS, at 2 (Nov. 15, 2013), https://perma.cc/PH64-XV7W. The State must retain "the requirement that Healthy Indiana Plan members make monthly account contributions" into "a Health Savings Account-like account." *Id.*

And a year later, the Governor reiterated the State's "clear" message "that Indiana will not expand traditional Medicaid" and would resist efforts "to remove or water down the Healthy Indiana Plan's core principles, essentially changing this proven program into an expansion of traditional Medicaid." Letter from Gov. Pence to President Obama, at 2 (Oct. 2, 2014), https://perma.cc/V3ET-Y95M.

11

### C.    Indiana expands Medicaid with HIP 2.0

Ultimately, Indiana and the federal government agreed on what became known as HIP 2.0. D32-3; CMS, *CMS and Indiana Reach Agreement on Medicaid Expansion* (Jan. 27, 2015), https://www.cms.gov/newsroom/press-releases/cms-and-indiana-agree-medicaid-expansion. Implemented in 2015, HIP 2.0 covers the Medicaid expansion population and certain adults who would have qualified for pre-expansion Medicaid coverage by virtue of being low-income parents or caretakers of Medicaid-eligible children. D32-3_19.

As with the original HIP, POWER accounts remained HIP 2.0's cornerstone. D32-3_27. To obtain CMS approval, however, Indiana agreed to several significant changes. One of those changes was to provide members a choice between two benefit packages: HIP Basic (which does not require a POWER account contribution) and HIP Plus. D32-3_3. Both benefit packages are approved as "benchmark" or "alternative benefit packages" in the state Medicaid plan. D32-3_3.

HIP Basic includes only essential health benefits and is only "available for individuals up to and including 100% federal poverty level . . . who do not pay a contribution to their . . . POWER" account.

12

Indiana Medicaid State Plan, *Alternative Benefit Plan Populations (HIP Basic)*, https://perma.cc/M37H-YU9G; *see* D32_2. Enrollees in HIP Basic are required to make time-of-service copayments for health services to the fullest extent permitted under traditional Medicaid. *See* D32-3_36–37.

HIP Plus is the "option for all eligible individuals with income up to and including 133%" of the [Federal Poverty Level] "who make a contribution to their POWER" account. Indiana Medicaid State Plan, *Alternative Benefit Plan Populations (HIP Plus)*, https://perma.cc/SE3T-BEFE; *see* D32-3_2. HIP Plus not only includes essential health benefits, but also provides enhanced benefits, such as vision, dental, and chiropractic services. D32-3_12–33. HIP Plus enrollees are generally not required to make copayments. D32-2_17–19.

To receive those benefits, HIP Plus enrollees must make monthly contributions to their POWER accounts that range from $1 to 2% of their monthly income. D32-3_7. Enrollees, however, can offset required contributions by rolling over unused contributions and using preventative services. D32-3_32–33. Adults with incomes greater than 100% of the federal poverty line are disenrolled from HIP Plus if they fail

13

to make required contributions (and at that point in time, could not reenroll for a six-month lockout period). D32-3_24; SAR8238. Adults with incomes at or below 100% of the federal poverty line are automatically transferred to HIP Basic. D32-3_24.

Neither HIP Basic nor HIP Plus includes a state assurance of non-emergency transportation. But managed care entities that provide services to HIP beneficiaries offer free transportation. SAR4269. And as with the original version of HIP, neither HIP Basic nor HIP Plus include retroactive coverage, *i.e.*, coverage for otherwise eligible services rendered up to three months before enrollment. D32-3_20; *see* AR2580. Studies revealed that those aspects had minimal impacts.[2]

---

[2] A 2015 report found that Indiana's retroactive coverage was "little use[d]"; "just 10 percent (628 of 5,950) of eligible members" submitted claims. *Prior Claims Payment Program Report* 4 (2015), https://perma.cc/9E6J-YQPD. The report attributed the low use to the "expansion of affordable healthcare coverage options through HIP" and the federal insurance marketplace. *Id.* A 2016 report found that, albeit "a small number" of beneficiaries "missed appointments due to transportation issues," the rates of missed appointments "were similar" among populations with and without state transportation assurance. Lewin Group, *Indiana HIP 2.0: Evaluation of Non-Emergency Medical Transportation (NEMT) Waiver* 42 (2016), https://perma.cc/DLZ8-VZH3.

14

After Indiana saw positive results from HIP 2.0's first few years, Indiana requested approval to make some amendments. AR2577–2668. Most significantly, Indiana proposed a new community-engagement requirement and surcharge to POWER account contributions for tobacco use. AR2. To implement these amendments, the Secretary issued a waiver for February 1, 2018, to December 31, 2020. AR1. Before the community-engagement requirement took effect, Indiana suspended its implementation pending resolution of ongoing litigation. *See* D18-2. And when the COVID-19 public health emergency occurred shortly thereafter, Indiana temporarily suspended any penalties for failing to make POWER account contributions for the emergency's duration in exchange for new federal funding. *See* Ind. Code § 12-8-1.5-7.5 (authorizing the suspension of requirements necessary for funding under the Families First Coronavirus Response Act, Pub. L. 116-127, § 6008(b)(2)–(3), 134 Stat. 178, 208 (2020)); SAR1559.

## III.   The Secretary's 2020 Approval and 2023 Determination

In January 2020, Indiana sought a new waiver for HIP 2.0 that would run through December 2030. SAR8234, 8238–39. Indiana pointed out that HIP remained highly popular—88% of beneficiaries were

15

somewhat or very satisfied—and beneficiaries were more likely to use preventative services and primary care. SAR8506, 8510.

## A. The Secretary's 2020 approval

In October 2020, while this litigation was pending, the Secretary issued a new approval for HIP, approving certain components related to enhanced benefits for substance use disorders and serious mental illness for 5 years and the remaining components for 10 years. SAR1554–74. He concluded that the project would serve an "important objective of the Medicaid program" by "expanding the scope of coverage." SAR1555. He also judged that HIP was likely to improve the "health and wellness of beneficiaries" and prepare them to "transition to commercial health insurance as their finances allow." SAR1562, 1565. Those outcomes, in turn, would "reduce the cost of providing . . . health care coverage." SAR1562, 1565. "Improved fiscal sustainability," the Secretary explained, will "help Indiana to continue to cover non-mandatory benefits and eligibility groups (such as the Patient Protection and Affordable Care Act expansion population and dental and vision benefits)." SAR1564. The Secretary added the waiver would provide expanded substance abuse and mental illness benefits as well. SAR1560–61.

16

Although Section 1115 requires only that the Secretary consider "the project" as a whole, the Secretary individually considered HIP's elements. 42 U.S.C. § 1315. He explained that POWER account contributions were "designed to improve beneficiary health and wellness by encouraging beneficiaries to take ownership of decisions about health care options." SAR1563. Waiving retroactive eligibility was expected to "improv[e] uptake of preventive services, thus improving beneficiary health." SAR1564. And the waiver of non-emergency transportation was likely to help the State "better contain Medicaid costs." SAR1561.

The Secretary also conditionally approved community-engagement requirements and a six-month lockout (*i.e.*, inability to re-enroll), contingent "on the Supreme Court issuing a decision in *Azar v. Gresham*, No. 20-37"—which concerned the Secretary's approval of work requirements in Arkansas—"that legally authorizes this element of the demonstration." SAR1576. The Supreme Court, however, never reached the merits. It determined that the dispute was moot and vacated a decision disapproving of Arkansas's work requirements. *See Becerra v. Gresham*, 142 S. Ct. 1665, 1665–66 (2022). Consequently, the conditional approval for Indiana's community-engagement requirement and lockout

17

period was withdrawn, while other HIP elements were reviewed. SAR840.

## B.    The 2023 determination

In December 2023, the review concluded. SAR1. Although the agency expressed "concerns" about "premiums," it decided against withdrawing the waiver. SAR1. "[W]ithdrawing" the waiver would have been "too disruptive, particularly" while Indiana was in the process of unwinding temporary measures put into place during the COVID-19 public health emergency. SAR1. The agency observed that requiring Indiana to make additional changes could "affect [its] ability to prioritize the unwinding efforts," "lead to inaccuracies in beneficiary eligibility determinations," and would require changes to "eligibility systems," "managed care contracts," and "beneficiary communications." SAR2.

## IV.    District Court Proceedings

### A.    Plaintiffs' challenge

In September 2019, four individuals filed this lawsuit to challenge the waiver that the Secretary issued for HIP 2.0 in 2018. D1. A major focus of the complaint was the community-engagement requirement.

18

D1_¶¶ 7–12. The Court permitted Indiana Family and Social Services Administration to intervene as a defendant. Order_10/15/2019.

The district court stayed the case for several years, first because of the COVID-19 public health emergency, and then while CMS completed its review of its 2020 approval. Order_4/6/2020; Order_7/8/2021; Order_3/28/2024. After the Secretary issued its 2020 approval, plaintiffs filed an amended complaint challenging that approval. But the case remained stayed through the end of the public health emergency.

In January 2024, three individuals (including one plaintiff from the original lawsuit) filed another complaint, the operative one here. The complaint challenges the Secretary's 2020 approval for HIP and his December 2023 decision not to disturb that approval. D50-1. The federal defendants and plaintiffs filed cross-motions for summary judgment, D54, D55, and Indiana filed a motion to dismiss, D57.

## B.    The district court's decision

The district court ruled in plaintiffs' favor on Count I of the supplemental complaint, vacated the Secretary's 2020 approval, and remanded the matter. D50-1_34–35; D68_63–64.

19

After rejecting arguments that plaintiffs lacked standing, the court held that the Secretary had failed to adequately explain how Indiana's demonstration project was likely to "promote the objectives" of Medicaid. D68_56. According to the court, "the provision of medical assistance to beneficiaries—both recipients of traditional Medicaid and members of the expansion population—is the central purpose of the Act." D68_34. The court faulted the Secretary for allowing Indiana to require POWER account contribution requirements and not provide retroactive coverage or non-emergency transportation. D68_35. Although the court conceded that the Secretary "acknowledged the existence of" these concerns, it accused him of "largely look[ing] the other way." D68_34, 36–37.

The court rejected the State's argument that, absent the challenged features of HIP, Indiana would never have opted to expand Medicaid coverage or offer enhanced benefits. D68_47–48. In the court's view, the Secretary was required to presume that Indiana had already expanded Medicaid in evaluating HIP: "[T]he relevant question under Section 1115 is not whether a demonstration project will increase coverage as compared to unexpanded Medicaid . . . but whether the project will increase coverage as compared to expanded Medicaid with no waivers."

20

D68_48. And under that standard, the court deemed the Secretary's analysis insufficient. D68_48.

Finally, the court rejected arguments that HIP would promote coverage by improving beneficiary health and Medicaid's sustainability. Improving health, the court reasoned, "is not a stand-alone goal of Medicaid." D68_49. And the court ruled that "the Secretary's consideration of [sustainability] was deficient." *Id.* The court brushed off the Secretary's explanation that HIP would conserve resources by saying that the Secretary made no specific findings about how much Indiana would save and did not cite evidence showing that Indiana could not continue to provide Medicaid without the waiver. D68_53, 55–56.

The court vacated the Secretary's 2020 approval, rejecting Indiana's urging for remand without vacatur. *See* D68_58–63. In so holding, the court rejected Indiana's argument that "vacatur would undermine its ability to provide coverage to the expansion population at all." D68_62. It was "not persuaded by Indiana's arguments" that vacating the waivers underlying HIP would result in the Medicaid population losing coverage. D68_62.

21

## C.    Subsequent proceedings

After the district court entered judgment in plaintiffs' favor, Indiana moved for entry of judgment under Rule 54(b). D69. The district court granted the motion in part. D71_1–2. It stated that its judgment was already "final and immediately appealable," but to allay any concerns about appealability, expressly found that "there is no just reason for delay of appellate review" pursuant to Rule 54(b). D71_1–2.

Indiana appealed and moved for a stay pending appeal. D_72; D_73. Indiana explained that vacating the approval jeopardized benefits for more than 300,000 individuals receiving coverage through HIP as well as funding for the entire project. D74-1_5–8. The district court's decision to vacate the approval also meant that Indiana would have to make "extensive system changes" to contracts, systems, and HIP's design—a process that would take at least 12 months. D79-1_¶ 5; *see* D74-1_2, 6–8.

In view of these impacts, plaintiffs stated they would not oppose a partial stay. D78_17–18. Ultimately, the district court partially stayed its decision to vacate the Secretary's approval. D83. Under the stay, the entire approval remains intact except for provisions related to payment or non-payment of POWER account contributions. D83.

22

Shortly thereafter, the plaintiffs moved to dismiss the appeal for lack of jurisdiction. Doc. #2072962; Doc. #2074494. That motion was referred to the merits panel. Doc. #2088056.

## SUMMARY OF ARGUMENT

I.     The Secretary's 2020 approval for the Healthy Indiana Plan (HIP) should stand. Section 1115(a) authorizes the Secretary to waive otherwise applicable requirements for a demonstration project that "in [his] judgment" is "likely" to "assist in promoting the objectives" of Medicaid. 42 U.S.C. § 1315(a).

The Secretary rationally concluded that a waiver for HIP would likely promote Medicaid's objective of providing coverage for needy populations. Without a waiver, Indiana would not have expanded Medicaid to hundreds of thousands of Hoosiers who lacked coverage. The district court erred in demanding that the Secretary assume Indiana would have expanded Medicaid without a waiver. Regardless, the Secretary rationally explained why HIP—which delivers non-mandatory benefits and eliminates time-of-service copayments that can impede access to services—enhances coverage. He considered and dealt with

23

objections regarding POWER account contributions, retroactive coverage, and non-emergency medical transportation.

The Secretary also rationally explained why a waiver would promote sustainable coverage by improving health, preparing beneficiaries for commercial insurance, and delivering non-mandatory coverage. In critiquing the Secretary's analysis, the district court misapprehended the Secretary's reasoning and substituted its judgment for the Secretary's predictive analysis. The court, moreover, misconstrued Section 1115 in declaring that improving beneficiaries' health is not among Medicaid's objectives.

II.    The district court should not have vacated the Secretary's 2020 approval in any event. Plaintiffs lack standing to seek vacatur. Plaintiffs—all of whom have voluntarily decided to make POWER account contributions for enhanced coverage—cannot identify an injury traceable to the approval that vacatur would remedy. Vacating the approval jeopardizes the very benefits plaintiffs wish to keep.

Even if plaintiffs had standing, the consequences of vacatur cut decisively against it. Vacatur jeopardizes benefits for hundreds of thousands of Hoosiers and requires extensive administrative changes.

24

Meanwhile, there is a substantial chance that the Secretary could remedy any deficiencies with his reasoning on remand.

III.    The Court should reject arguments that the district court's judgment vacating the approval undergirding HIP is not appealable. Pursuant to Rule 54(b), the district court entered a final judgment on a distinct claim and vacated the challenged approval in full. Practical considerations, moreover, reinforce that the judgment is final and appealable. Unless Indiana can appeal now, it risks losing any meaningful opportunity to challenge the order vacating the approval. Whatever action the Secretary takes on remand, any further litigation will concern that new action and may not even occur in this Circuit. And over the months or years required for a remand, Indiana will lack critical authorities needed to operate a Medicaid program on which hundreds of thousands of Hoosiers rely for healthcare coverage.

## STANDARD OF REVIEW

A grant of summary judgment is reviewed de novo. *See Thompson v. District of Columbia*, 832 F.3d 339, 344 (D.C. Cir. 2016). The Court "view[s] the evidence in the light most favorable to the party opposing summary judgment" and "draw[s] all reasonable inferences in that

25

party's favor." *Id.* "'The district court's decision to vacate'" pending remand is reviewed "'for abuse of discretion.'" *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1051 (D.C. Cir. 2021).

## ARGUMENT

I.    **The 2020 Approval—Which Underpins Indiana's Expansion of Medicaid Coverage and Benefits—Is Consistent with Medicaid's Objectives and Reasoned Decisionmaking**

Ever since the Supreme Court ruled that Medicaid expansion is optional, Indiana made clear that it would not expand traditional Medicaid. Expansion would occur only if Indiana could use its innovative, consumer-driven Healthy Indiana Plan (HIP). As the district court observed, "Indiana would expand through HIP or not at all." D68_11.

Faced with the choice between HIP and no expansion, the Secretary rationally concluded that authorizing Indiana to expand Medicaid through HIP would likely promote Medicaid's objective of providing coverage to needy populations. HIP would not only provide coverage to hundreds of thousands of Hoosier adults in the Medicaid expansion group. It would also deliver extra benefits—such as vision, dental, and chiropractic coverage—and eliminate unpredictable time-of-service copayments that would otherwise apply.

26

Obtaining this enhanced coverage would require adults in the Medicaid expansion group to make predictable, monthly contributions to Personal Wellness and Responsibility (POWER) accounts. As the Secretary observed, data showed that the contributions were affordable. And waiving requirements to provide non-emergency transportation and three months of retroactive coverage would have minimal impacts.

The district court did not dispute that, compared to what would exist without HIP, HIP increased coverage. Instead, the court faulted the Secretary for not asking whether HIP was better than "expanded Medicaid with no waivers." D68_48. But Section 1115 merely requires the Secretary to ask whether a demonstration project is "likely" to "assist in promoting [Medicaid's] *objectives*." 42 U.S.C. § 1315(a) (emphasis added). It does not require what the district court demanded.

Regardless, the Secretary adequately explained why HIP is likely to further Medicaid's objectives of providing coverage and doing so sustainably. He discussed at length the costs and benefits of required contributions to POWER accounts and other features of HIP, explaining why those features were likely to sustain Indiana's provision of enhanced coverage. The district court's disagreement with that analysis is not a

27

sufficient reason to deem the Secretary's analysis arbitrary and capricious.

## A. Section 1115 gives the Secretary broad discretion to approve demonstrations

Section 1115(a) authorizes the Secretary to waive Medicaid requirements "to the extent and for the period he finds necessary" for a State to carry out any project that "in the judgment of the Secretary" is "likely" to "assist in promoting the objectives" of Medicaid. 42 U.S.C. § 1315(a). That provision—which focuses on the Secretary's predictive judgment—"exudes deference." *Webster v. Doe*, 486 U.S. 592, 600 (1988); *see FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 521 (2009) (an "agency's predictive judgment" "merits deference"). "[T]he only limitation imposed on the Secretary was that he must judge the project to be 'likely to assist in promoting the objectives' of" Medicaid. *Aguayo v. Richardson*, 473 F.2d 1090, 1105 (2d Cir. 1973).

In authorizing the Secretary to approve demonstration projects, moreover, Congress did not require the Secretary to pursue a single objective. Through Medicaid, Congress sought to pursue diverse goals—from providing services to needy populations to improving care to controlling costs. *See Nazareth Hosp. v. Sec'y U.S. Dep't of Health & Hum.*

28

*Servs.*, 747 F.3d 172, 181 (3d Cir. 2014); *Pharm. Rsch. & Mfrs. Am. v. Thompson*, 362 F.3d 817, 825 (D.C. Cir. 2004). Those objectives are reflected in the text. Medicaid authorizes coverage for "preventative services" in part because Congress wants to keep people healthy. 42 U.S.C. §§ 1396a(k), 1396d(a)(13), 1396u-7(b). Medicaid is concerned with "quality" of care too. §§ 1396a(a)(22), (a)(30)(A), (a)(33)(A). And as with any program, cost control and efficiency are important. *See Pharm. Rsch.*, 362 F.3d at 825. Section 1115 thus contemplates that a project may advance Medicaid's objectives even if it "result[s] in an impact on eligibility, enrollment, benefits, cost-sharing, or financing." § 1315(d).

In view of the discretion Congress conferred on the Secretary, any judicial review of his judgment is circumscribed. The "central question" is whether the Secretary "rationally could have determined" that a project is likely to assist in advancing Medicaid's objectives and that the waiver's scope and duration is necessary to carry out the project. *C.K. v. N.J. Dep't of Health & Hum. Servs.*, 92 F.3d 171, 183 (3d Cir. 1996); *see FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). The "statute—speaking in terms of an otherwise unfettered 'judgment'—does not require that . . . every i must be dotted and every t crossed." *Aguayo*,

29

473 F.2d at 1107. A decision not fully explained may be upheld "if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974). In view of those principles, the Secretary's decision to approve Indiana's demonstration project in 2015 and continue it in 2020 was lawful.

### B. The Secretary rationally concluded that the waiver would enhance coverage for needy populations

It is common ground that one of Medicaid's principal objectives is to provide healthcare coverage for needy populations. D68_34. Authorizing Indiana's demonstration project furthers that goal. HIP allowed Indiana to expand Medicaid to populations who would have received no coverage without the waiver. HIP, moreover, gives participants who make modest, predictable contributions to POWER accounts benefits beyond what they would otherwise receive and exempts them from unpredictable time-of-service copayments. Thus, the waiver increases (or preserves) both who is eligible for Medicaid and the services for which they are eligible.

30

1.  **The waiver allows Indiana to expand Medicaid and provide optional benefits**

As the Supreme Court held in its landmark case concerning the Affordable Care Act, States are not required to cover the Medicaid expansion population. *See NFIB*, 567 U.S. at 577–78 (opinion of Roberts, C.J., joined by Breyer and Kagan, JJ.); *see id.* at 671–672 (Scalia, Kennedy, Thomas, and Alito, JJ., dissenting). And States that elect to expand coverage are not required to provide the full scope of traditional Medicaid benefits. Participating States need only to provide essential health benefits, 42 U.S.C. § 1396u-7(b)(2)—a category that excludes benefits like vision, dental, and chiropractic, SAR1556 n.2. And participating States may require the Medicaid expansion population to pay up to 10% of the cost of any services. 42 C.F.R. § 447.52(a)–(b), (e).

Considering that States are not required to expand Medicaid or provide more than essential health benefits, the Secretary rationally concluded that granting a waiver for Indiana's expansion program was likely to advance an "important objective of the Medicaid program" by "expanding the scope of coverage." SAR1555; *see* SAR1556 n.2. Under Indiana law, Indiana cannot expand traditional Medicaid. State law permits Indiana to cover the "adult group described in 42 CFR 435.119"—

31

the adult Medicaid expansion population—"only" through HIP. Ind. Code § 12-15-44.5-10(a). And state law permits Indiana to provide non-mandatory benefits only to participants who contribute to POWER accounts. § 12-15-44.5-10(b)(1)–10(b)(8). As Indiana explained in seeking a waiver, state law "expressly prohibit[s] the continuation of Medicaid expansion in the State except through HIP." SAR8240. The Secretary rationally concluded a waiver promotes coverage. SAR1555.

A federal evaluation of HIP supports the Secretary's conclusion. After examining years of data, the evaluation found that the "most important lesson learned" from HIP is that the demonstration "achieved a key goal of both the Affordable Care Act and the state—a significant expansion in health insurance coverage." SAR4308; *see* SAR4281 (HIP "increased coverage . . . and increased access to health care"); SAR4288, 4296, 4608 (similar). "Across the board, interviewees, and focus group participants emphasized increased health insurance coverage and improved access to health care as major wins for HIP 2.0." SAR4280.

### 2.    The district court adopted the wrong baseline

The district court did not dispute that, in seeking to expand Medicaid, Indiana made clear that it "would expand [Medicaid] through

32

HIP or not at all." D68_11. Nor did the court dispute that, compared to "what coverage would have been" without HIP, HIP increased coverage. D68_47. Instead, the court demanded proof that HIP would "increase coverage as compared to expanded Medicaid with no waivers." D68_48. Nothing in Section 1115 requires that comparison.

By its terms, Section 1115 directs the Secretary to ask whether a project is "likely to assist in promoting the *objectives*" of Medicaid. 42 U.S.C. § 1315(a) (emphasis added). It does not require the Secretary to ask whether the project is superior to "expanded Medicaid with no waivers." D68_48. So it is perfectly reasonable to ask whether a project would better promote Medicaid's objectives than what would exist in its absence. *See Georgia v. Brooks-LaSure,* 2022 WL 3581859, at *14–15 (S.D. Ga. Aug. 19, 2022) (holding the Secretary arbitrarily evaluated a project that expanded Medicaid "against a baseline of full Medicaid expansion, rather than taking the demonstration on its own terms").

If Congress had wanted the Secretary to ask whether a project provides greater coverage or benefits than "expanded Medicaid with no waivers," "Congress could easily have said so." *Kucana v. Holder*, 558 U.S. 233, 248 (2010). Instead, it authorized the Secretary to waive "any"

33

Medicaid requirement "to the extent" that he deems necessary for a project, 42 U.S.C. § 1315(a)(1)—even if doing so "impact[s] . . . eligibility, enrollments, benefits, cost-sharing, or financing," § 1315(d)(1). Congress would not have authorized actions that impact enrollment and benefits if it wanted every project to cover more people and provide greater benefits than "expanded Medicaid with no waivers."

It, moreover, makes no sense to require the Secretary to "assume" that a State has already "expanded Medicaid with no waivers" when evaluating a project *that is the mechanism for expanding it.* D68_44–45. If that were the standard, the Secretary should never have granted a waiver for HIP in 2015—even though the alternative would have been to leave hundreds of thousands of uninsured Hoosiers (plaintiffs included) without public coverage. "[N]othing but total, unconditional expansion would stand up." *Brooks-LaSure*, 2022 WL 3581859, at *14.

The district court's response—that States cannot "implement [Medicaid's] expansion *à la carte*," D68_44—misses the point. This case is not about whether States can unilaterally decide how they wish to expand Medicaid. It is about whether, exercising congressionally conferred authority to waive otherwise applicable requirements, the

34

Secretary can rationally conclude that expanding Medicaid through a demonstration project is consistent with Medicaid's "objectives." 42 U.S.C. § 1315(a). Clearly, faced with the choice of no Medicaid expansion in Indiana and expansion in some modified form, the Secretary could rationally decide that the latter would serve an "important objective of the Medicaid program" by "expanding the scope of coverage." SAR1555.

The district court was thus wrong to characterize Indiana's argument that there would be no Medicaid expansion without HIP as a "threat" to "simply de-expand Medicaid." D68_43–44. That characterization overlooks that HIP 2.0—which the Secretary first approved in 2015 and reauthorized in 2020—is how Indiana expanded Medicaid. HIP is not a later-developed project. And the HIP features at issue here (*e.g.*, POWER accounts) are not a recent innovation, but have always been "central components of the HIP design." SAR8250; *see* pp. 7–8, *supra*. So upholding the waiver granted to Indiana would not imply that the Secertary could rationalize any waiver on the theory that a State could always withdraw from Medicaid entirely. *Contra* D68_44.

Nor is the district court correct that maintaining Medicaid expansion is "mandatory" in Indiana. D68_27, 43–44. In *NFIB*, the

35

Supreme Court held that any spending conditions must be "'unambiguous[]'" and that States must have a "genuine choice" as to whether to expand Medicaid. *NFIB,* 567 U.S. at 583, 587 (opinion of Roberts, C.J.); *see* AR315 (conceding that expansion States "may decide later to drop the coverage"). When Indiana decided to expand Medicaid, it did so on a shared understanding with the federal government that any expansion was optional and would be "through HIP or not at all." D68_11. To invalidate that understanding now would recreate the very constitutional problem that *NFIB* identified.

At bottom, the district court's disagreement with the Secretary sprung from its assumption that it had "seen this film before." D68_21. The court saw no difference between this case and cases involving challenges to work requirements. D68_43. But the work-requirement cases—which the Supreme Court granted certiorari to review and then vacated before reaching the merits, *see Becerra v. Gresham*, 142 S. Ct. 1665, 1665–66 (2022)—involved proposals to impose work requirements on populations *already* covered by Medicaid. *See Gresham v. Azar*, 363 F. Supp. 3d 165, 171 (D.D.C. 2019), *aff'd*, 950 F.3d 93 (D.C. Cir. 2019), *vacated and remanded sub nom. Becerra v. Gresham*, 142 S. Ct. 1665

36

(2022) (noting Arkansas's project already covered "more than 278,000 individuals"); *Philbrick v. Azar*, 397 F. Supp. 3d 11, 18 (D.D.C. 2019), *aff'd*, No. 19-5293, 2020 WL 2621222 (D.C. Cir. May 20, 2020), *vacated and remanded sub nom. Becerra v. Gresham*, 142 S. Ct. 1665 (2022) (explaining New Hampshire had expanded Medicaid before the waiver at issue). This case concerns a project expanding Medicaid to a new population and requirements that have existed since the project's inception. The Secretary rationally judged that HIP is consistent with Medicaid's objectives.

### 3. The district court improperly second-guessed the Secretary's weighing of evidence

Even if "expanded Medicaid with no waivers" is the applicable baseline, the Secretary rationally concluded HIP promotes coverage overall. HIP provides "non-mandatory" benefits, such as vision, dental, and chiropractic, that traditional Medicaid does not. SAR1564. And HIP relieves enrollees of making copayments for services. SAR1571, 1605. Of course, HIP Plus enrollees must make monthly contributions to POWER accounts ranging from $1 to $20 a month for individuals. SAR1600–01. But those contributions are "generally affordable." SAR1570; *see* SAR5960. Indeed, 95% of beneficiaries said they would "re-enroll" under

those terms and 80% "would pay more." SAR8250, 8252. And if enrollees are below the poverty line or in a special group, they do not lose essential health benefits for failure to make contributions. SAR1565–66, 1600–01.

The district court accused the Secretary of failing to consider risks to coverage, observing that some Hoosiers in the Medicaid expansion group have been disenrolled for not making contributions. D68_35–37. But the Secretary discussed those risks. SAR1570–71. He observed that contributions were "generally affordable," that disenrollment rates for nonpayment were low, that those rates "decreased over time," and that he would continue monitoring the program. SAR1564, 1570–71. The district court's disagreement about the reasons for the decrease fails to show that analysis was arbitrary. *Prometheus Radio*, 592 U.S. at 425–26.

Further, the Secretary observed that persons in the Medicaid expansion group making required contributions need not make "co-payments." SAR1571. That is no small matter: under default Medicaid rules, States can require individuals in the expansion group with incomes over 100% of the [Federal Poverty Level] to cover up to 10% of service costs "as a condition of receiving" service. 42 C.F.R. § 447.52(a)–(b), (e). And even those with incomes under the [Federal Poverty Level] can incur

38

time-of-service copayments—$4 per doctor's visit and $75 per hospital stay—that may quickly exceed the minimal contributions HIP requires. *Id.*; SAR1600. Little wonder then that HIP participants have overwhelmingly reported their minimal POWER account contributions are "worthwhile" to "obtain expanded benefits" and eliminate "cost sharing." SAR4279; *see* SAR8250, 8252.

The district court did not address that making monthly contributions eliminated copayments. Instead, the court focused solely on the possibility of disenrollment for not making contributions. D68_37–38. But nothing in Section 1115 requires the Secretary to ensure that every project element enhances coverage. Its focus is on the "project"—that is, the project *as a whole*. 42 U.S.C. § 1315(a); *see* § 1315(d). In critiquing how the Secretary balanced competing considerations impacting coverage, moreover, the court overstepped its limited role. Reasoned decisionmaking only requires an agency to address a problem, not demonstrate that its conclusion is correct. *See Lindeen v. SEC*, 825 F.3d 646, 658 (D.C. Cir. 2016); *see also Fox Television*, 556 U.S. at 521.

The court also dinged the Secretary for waiving retroactive coverage and non-emergency transportation requirements, saying those

39

elements, "by definition, *reduce* coverage." D68_38–41. Again, however, Section 1115 requires the Secretary to ask whether a "project" likely promotes Medicaid's objectives. 42 U.S.C. § 1315(a). It doesn't require proof that every individual aspect of the project enhances coverage. And evidence suggested that the waivers had minimal impacts. Relatively few Hoosiers ("just 10 percent") sought retroactive coverage, and to mitigate any impacts, Indiana would provide "outreach and education" about enrollment and an expedited enrollment process. SAR1564–65.

As for non-emergency medical transportation, the Secretary observed that three of the four managed care entities serving HIP "offer[ed]" non-emergency medical transportation "as an enhanced service." SAR1562. So enrollees wanting that benefit could select a provider offering the service—a critical point that the district court ignored. *See* D68_39. And, as the Secretary pointed out, an evaluation showed that a state assurance of non-emergency transportation "did not appear" to affect whether beneficiaries were likely to miss appointments. SAR1562. The Secretary could conclude that, considered as a whole, HIP would promote coverage for needy populations.

40

## C.    The Secretary rationally concluded a waiver would promote sustained coverage

The Secretary rationally concluded that HIP was coverage-promoting in another way too—it promotes Medicaid's long-term "sustainability" by improving beneficiary health, generating efficiencies, and preparing beneficiaries for commercial coverage. SAR1557, 1561, 1563–66, 1572. In authorizing Medicaid, Congress no doubt cared about "furnish[ing] medical assistance" to needy populations. 42 U.S.C. § 1396-1. But that was not Congress's sole concern. Another one of Medicaid's stated purposes—"help[ing] families and individuals attain or retain capability for independence"—reveals that Congress cared whether Medicaid would help those it serves lead better, healthier lives. *Id.* Statutory provisions relating to "preventative services," §§ 1396a(k), 1396d(a)(13), 1396u-7(b), and "quality" of care, §§ 1396a(a)(22), (a)(30)(A), (a)(33)(A), reflect that same concern for beneficiaries' health.

Costs matter to Congress too. Medicaid's appropriations provision explains that appropriations are "[f]or the purpose of enabling each State" to furnish "medical assistance" and "rehabilitation and other services" to needy persons "*as far as practicable under the conditions in*

41

*such State*." 42 U.S.C. § 1396-1 (emphasis added). That italicized language reflects that government resources are finite. Every dollar spent on one service (*e.g.*, dental, vision, or other benefits) or one population (*e.g.*, the expansion population) is one less dollar that can be spent on another service or needy group. Thus, as this Court has held, it is "reasonable on its face" to conclude that efforts to control costs, to improve health, and to prevent persons from unnecessarily utilizing Medicaid is consistent with its objectives. *Thompson*, 362 F.3d at 825.

> 1. **HIP promotes sustainability by improving beneficiary health, finding efficiencies, and preparing beneficiaries for commercial coverage**

The Secretary rationally concluded HIP is likely to promote sustainable coverage and improved health. As the Secretary explained, Indiana's POWER account requirements "are designed to improve beneficiary health and wellness by encouraging beneficiaries to take ownership of decisions about health care options and determine if it is more cost efficient and practical for them to enroll in an enhanced health package to receive vision and dental benefits." SAR1563. An "independent evaluation reported that HIP Plus members had higher participation and utilization rates for preventative services, primary

42

care, and specialty services, as well as better prescription adherence rates." SAR1564; *see* SAR1543–55, 6384–86. And HIP's replication of common features of commercial coverage through POWER accounts "prepare[s] beneficiaries for commercial insurance." SAR1571.

The waivers for retroactive coverage and non-emergency transportation foster health and sustainability in similar ways. They reduce financial strain, prepare beneficiaries for commercial insurance so that they do not return to Medicaid rolls, and in the case of no retroactive eligibility, encourage persons to enroll (and remain enrolled) in Medicaid and to obtain preventative coverage. SAR1562, 1564, 1571–72; *see* SAR8256, 8261. As the Secretary explained, knowing there is no retroactive coverage encourages enrollees to "obtain health coverage as soon as possible after becoming eligible, rather than potentially waiting until they are sick," and to "maintain health coverage, even when healthy." SAR1564. As one study found, "more enrollees" in HIP "obtain[ed] preventative care over time." SAR4309; *see* SAR1564.

Meanwhile, as discussed above (pp. 37–40, *supra*), the Secretary had rational grounds for believing that waivers for POWER account contributions, retroactive coverage, and non-emergency medical

43

transportation have minimal impacts. A survey found that beneficiaries found POWER account contributions "generally affordable" and "worthwhile" to obtain enhanced benefits and eliminate unpredictable time-of-service copayments. SAR1570, 4279. Few enrollees used retroactive coverage anyway. SAR1564–65. And to mitigate any potential impacts, Indiana would provide "outreach and education" and expedited enrollment. SAR1571–72. Any enrollees wanting non-emergency transportation could choose a plan offering free transportation. SAR1562.

## 2. The district court misapprehended how the waiver promotes sustainability

In rejecting the Secretary's explanations, the district court took a cramped view of Medicaid's objectives and the Secretary's analysis. It declared that the Secretary cannot consider whether a project improves health, because health and keeping people off Medicaid rolls are "not a stand-alone goal of Medicaid." D68_49. But "'no law'" pursues a single objective "'at all costs.'" *Luna Perez v. Sturgis Pub. Sch.*, 598 U.S. 142, 150 (2023). And Medicaid is no exception. Both its stated purposes and requirements reflect concern for beneficiaries' health and program cost. *See* pp. 41–43, *supra*. Indeed, Section 1115 itself authorizes waivers that "impact on eligibility, enrollment, benefits, cost-sharing, or financing."

44

§ 1315(d)(1). The district court erred in treating Medicaid as singularly focused on providing coverage without regard to real-world outcomes.

The court, moreover, ignored the Secretary's explanation of how improving health is related to providing coverage. "[E]ven if . . . providing health care coverage is the exclusive objective of the Medicaid program," the Secretary explained, HIP's goal of "facilitating the transition of Medicaid beneficiaries to commercial coverage and improving their health" promotes "provision of coverage." SAR1555–56; *see* SAR1561–62. That makes sense. As this Court has recognized, efforts to keep non-Medicaid populations off Medicaid rolls can promote Medicaid's fiscal sustainability by making "more resources . . . available" for Medicaid beneficiaries. *Thompson*, 362 F.3d at 825. *A fortiori* efforts to improve Medicaid beneficiaries' health and to ensure those able to transition off Medicaid stay off Medicaid are likely to sustain Medicaid coverage.

The district court quibbled with the Secretary's explanation, faulting the Secretary for purportedly ignoring impacts on coverage. D68_50–51, 54–55. But the Secretary discussed them, taking nine pages to explain why the project was likely to promote health and sustainability notwithstanding potential coverage impacts. *See* pp. 41–44, *supra*;

45

SAR1557–66. For example, he cited evidence that HIP's design would promote a sustainable program by encouraging members to obtain preventive care and engage in healthy behaviors. SAR1562, 1564. The Secretary also discussed concerns that the waiver would result in some members being disenrolled for failure to make POWER account contributions, SAR1563–64, 1566–71, or that the loss of retroactive coverage would be detrimental, SAR1564–65, 1571–72. That discussion suffices. The Secretary was entitled to disagree with HIP's critics so long as he discussed their criticisms. *See Am. Fuel & Petrochemical Mfrs. v. EPA*, 937 F.3d 559, 581 (D.C. Cir. 2019).

The district court suggested that the Secretary failed to make a finding that the waiver would save Indiana money or balance savings against harms. D68_50–55. That is incorrect. The Secretary was quite clear that HIP would "improve the fiscal sustainability of the state's safety net." SAR1561–62, 1572. In making that finding, moreover, the Secretary was not required to quantify the exact amount of savings or offer a dire prediction that Medicaid funds would run dry without the waiver. *See Am. Council of Blind v. Mnuchin*, 977 F.3d 1, 8 (D.C. Cir. 2020) ("[A] predictive judgment that involves deductions based on the

46

expert knowledge of the agency[] therefore does not—if, indeed, it can—require complete factual support in the record.") (internal quotation omitted). Section 1115 does not require excruciating details—only a reasonable judgment call that HIP was "likely" to advance the Medicaid statute's objectives. 42 U.S.C. § 1315(a); *see Prometheus Radio*, 592 U.S. at 427 (rejecting argument that agency must have "empirical or statistical studies" before exercising its predictive judgment).

Nor was the Secretary's conclusion irrational simply because some evidence "suggested that the cost of charging enrollees premiums often exceeds the amount of the premiums collected." D68_53. As the Secretary understood, POWER account requirements do not save Indiana money by increasing income streams. Rather, they lower long-term healthcare costs by encouraging beneficiaries to "take ownership" of their health, seek preventative care, and lead healthier lives while preparing them for commercial insurance. SAR 1563, SAR1571. Beneficiaries who made contributions had "higher participation and utilization rates for preventive services, primary care, and specialty services, as well as better prescription adherence rates." SAR1564. Just as the Secretary rationally concluded a waiver would likely increase coverage and benefits, he

47

rationally concluded a waiver would likely improve health, and therefore the program's sustainability.

## II. The District Court Erred in Vacating the Approval, Which Undergirds Medicaid Benefits for Hundreds of Thousands

Although the Secretary rationally concluded that HIP is consistent with Medicaid's objectives, there is a more fundamental issue with the district court's decision to vacate the Secretary's approval—plaintiffs lacked standing to seek vacatur. And even if they had standing, the court erred in granting a remedy that jeopardizes coverage for the hundreds of thousands of low-income Hoosiers enrolled in HIP.

### A. Plaintiffs lack standing to seek vacatur

Article III requires a plaintiff to "plead and—ultimately—prove" that he has standing. *Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023). The plaintiff must demonstrate an injury in fact "that is both concrete and particularized," that is "fairly traceable to the challenged action of the defendant," and that is "likely" to "be redressed." *Id.* (cleaned up). A plaintiff must demonstrate standing for "each claim . . . press[ed]" and "each form of relief . . . s[ought]." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). Here, plaintiffs failed to allege an injury attributable to the Secretary's 2020 approval that its vacatur would redress.

48

### 1.    Rames lacks standing

The only plaintiff that the district court deemed to have a "concrete injury traceable" to the challenged approval is Emily Rames, an adult who alleges her income places her in the Medicaid expansion group. D68_24. Rames, like the other plaintiffs, desires to keep the coverage that she currently receives through HIP. She praises HIP for providing her "the opportunity to take care of [her] physical and mental health." D54-4_¶¶7–8. Her complaint is that, if she chooses to maintain that coverage, she must make monthly POWER account contributions. D50-1_¶170; D54-4_¶11; D68_24. But that injury is not traceable to the Secretary's approval and would not be redressed by vacating that approval for a simple reason: the approval is what provides Rames coverage.

As Indiana told the Secretary, SAR8240, state law permits Medicaid expansion "only" through HIP. Ind. Code § 12-15-44.5-10(a). And state law does not permit Indiana to "negotiate or change" the statutory requirement to condition coverage on POWER account contributions. § 12-15-44.5-10(b). That means invalidating approvals necessary for HIP's continued operation would not allow adults in the

49

Medicaid expansion group to maintain their coverage without making POWER account contributions. It would end their coverage.

The district court questioned whether vacatur would "automatically terminate" all coverage. D68_26. It cited another provision of state law that directs Indiana to terminate HIP should the program encounter funding shortfalls. *See* D68_26 (citing Ind. Code § 12-15-44.5-4(b)). But a final court decision invalidating a waiver would indeed threaten the "the vast majority" of HIP's state-provided funding, making it "difficult to see a path forward for HIP to continue." D74-1_8. Besides, the mere fact that HIP might not face immediate funding challenges so drastic as to require its termination does not imply that Indiana can operate HIP without all required approvals. State law directs that Indiana may cover the Medicaid expansion group "only in accordance with" state requirements. Ind. Code § 12-15-44.5-10(a).[3]

---

[3] The district court's observation about the lockout period's suspension, D68_26–27, ignores that Indiana temporarily suspended that requirement to obtain additional funding under the Families First Coronavirus Response Act, Pub. L. 116-127, § 6008(b)(2)–(3), 134 Stat. 178, 208 (2020), which provided new funding to States that agreed not to disenroll persons during the COVID-19 pandemic. SAR1559.

50

It is no answer to suggest that continued coverage of the Medicaid expansion group is "mandatory." D68_27. That defies the Supreme Court's holding that the federal government cannot "require" Indiana to expand Medicaid; it can only "create incentives." *NFIB*, 567 U.S. at 577 (opinion of Roberts, C.J., and Breyer and Kagan, JJ.); *see id.* at 588 (opinion of Roberts, C.J.). And critically, part of the incentive for Medicaid's expansion in Indiana was the ability to require POWER account contributions. SAR086 (approving POWER accounts as one of several "special terms and conditions . . . to enable Indiana to operate [HIP]"). As even the district court admitted, Indiana agreed to expand Medicaid through "HIP or not at all." D68_11. Retroactively changing the deal would be unconstitutionally coercive. *See NFIB*, 567 U.S. at 578 (opinion of Roberts, C.J., joined by Breyer and Kagan, JJ.).

Even if the district court were correct that vacating the waiver would not automatically terminate all coverage through HIP, it would prevent Rames from retaining the level of coverage she desires. By statute, the Medicaid expansion group is entitled only to essential or benchmark health benefits. 42 U.S.C. § 1396u-7(b)(2) (exempting the group from other requirements). Those benefits do not include the vision

51

and dental benefits that Rames desires to keep and intends to "use . . . in the near future." D54-4_¶ 7; *see* SAR1564. Thus, vacating the Secretary's approval would not redress Rames's purported injury. She would still lose benefits that she desires to retain.

The district court argued that Rames will remain eligible for all benefits she now receives because she "derive[s] [her] eligibility for Medicaid through Indiana's state plan" rather than the challenged approval. D68_27. That argument ignores the state plan's terms. Indiana's state plan—whose amendment "coincid[ed] with" the Secretary issuing a waiver for HIP, Indiana Register, Office of the Secretary of Family and Social Services, Indiana Medicaid (Feb. 13, 2015), https:// www.in.gov/fssa/hip/files/HIPSPAPublicNotice1.pdf—provides       two benchmark benefit categories: HIP Basic and HIP Plus. HIP Basic is only "available to individuals up to and including 100% federal poverty level . . . who do not pay a contribution to their [POWER] account." Indiana Medicaid State Plan*, Alternative Benefit Plan Populations (HIP Basic)*, https://perma.cc/M37H-YU9G. HIP Plus is the "option for all eligible individuals with income up to and including 133%" of the [Federal Poverty Level] "who make a contribution to their [POWER]

52

account." Indiana Medicaid State Plan, *Alternative Benefit Plan Populations (HIP Plus)*, https://perma.cc/SE3T-BEFE. The plan itself therefore conditions benchmark benefits for the Medicaid expansion group on making POWER account contributions. D74-1_6. And the state plan does not assure non-emergency transportation for either HIP Basic or HIP Plus beneficiaries. *See* Indiana Medicaid State Plan, *Benefits Assurances (HIP Basic)* at 2, https://perma.cc/JMV5-VTDN; Indiana Medicaid State Plan, *Benefits Assurances (HIP Plus)* at 2, https://perma.cc/T7JU-RZ5C. Consequently, far from entitling Rames to vision and other benefits, vacating the approval would eliminate them. D74-1_6.

That fact distinguishes this case from the Kentucky case that the district court cited regarding work requirements. D68_25–26. In that case, the challenged approvals added new conditions on coverage for people Kentucky largely already covered. *See Stewart v. Azar*, 313 F. Supp. 3d 237, 243 (D.D.C. 2018) (noting that the 2014 expansion project resulted in coverage for "more than 428,000 new residents" *before* the Secretary approved new restrictions under Section 1115). So vacatur of an approval for a later-added requirement would not disrupt benefits.

53

Here, plaintiffs are challenging the waiver that undergirds the demonstration project through which they receive their benefits.

Finally, the district court cited the principle that "those adversely affected by a discretionary agency decision generally have standing to complain that the agency based its decision upon an improper legal ground." D68_27–28 (quoting *FEC v. Atkins*, 524 U.S. 11, 25 (1998)). That proposition does not help Rames either. "[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation— a procedural right *in vacuo*—is insufficient to create Article III standing." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009); *see Univ. Medical Cntr. of S. Nev. v. Shalala*, 173 F.3d 438, 441 (D.C. Cir. 1999) ("[A]lleged illegality [of a decision] without an injury-in-fact does not satisfy standing requirements."). So Rames must show a concrete injury from the approval. She cannot. Her desire to see the approval vacated "cannot bootstrap [her] into federal court." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998).

## 2.    The other plaintiffs lack standing

The district court did not address Rose's and Lang's standing. They lack it too. Rose and Lang allege injuries from having to make POWER

54

account contributions. D59_3 ("Plaintiffs Monte A. Rose and Chelsey Lang stand to lose coverage for these services only if they do not pay premiums, an impending injury that is a direct result of the 2020 approval."). That is not an injury traceable to the Secretary's approval but to their own choices. Under the approval, Rose and Lang—both of whom have incomes below 100% of the federal poverty line, D54-2_¶4; D54-3_¶15—are not required to make POWER account contributions to receive essential health benefits. SAR1581. Rose and Lang need make POWER account contributions only if they voluntarily decide those contributions are worthwhile to obtain enhanced benefits, such as vision and dental, and to avoid time-of-service copayments. Plaintiffs cannot manufacture standing by making a voluntary choice and then complaining about that choice's consequences to the courts. *See Petro-Chem Processing, Inc. v. EPA*, 866 F.3d 433, 438 (D.C. Cir. 1989).

Perhaps Rose and Lang would prefer a world in which they can continue receiving vision and dental care and can forego copayments without having to make POWER account contributions. But vacatur of the Secretary's approval would not create their dream world. Vacatur would mean that Rose and Lang are only entitled to the coverage

55

available under the state plan—which does not entitle them to vision or dental benefits. SAR1556. And both would be subject to time-of-service copayments, 42 C.F.R. § 447.52(b); Indiana Medicaid State Plan, *Medicaid Premiums and Cost Sharing*, https://perma.cc/F5UK-WDK3—a potentially grave expense for Lang, who "regular[ly] visits with primary care providers," D54-3_¶10, and Rose, who has "chronic health conditions," D54-2_¶13. The $75 copayment required for a single hospital visit or the $4 copay for a single doctor's visit would exceed the $1 per month that Rose chose to pay in the past to avoid copayments. D54-2_¶16; 42 C.F.R. § 447.52(b)(1).

To the extent that plaintiffs allege injuries based on the theory that the approval does not entitle them to non-emergency medical transportation or retroactive coverage, they cannot establish standing either. First, plaintiffs cannot show an "actual or imminent" injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). None alleges a current or imminent need for non-emergency transportation or retroactive coverage. Rather, they speculate about the possibility of a future need "*if* [a] car breaks down" before an appointment or another remote contingency occurs. D54-4_¶9 (emphasis added); *see* D54-2_¶8

56

(explaining Rose often bikes to appointments and has non-emergency transportation through his health plan). Those allegations are insufficient to establish a "'substantial risk'" of future harm. *Union of Concerned Scientists v. U.S. Dep't of Energy*, 998 F.3d 926, 929 (2021). And while Rose and Lang allege they have medical debt, neither alleges those expenses would be eligible for retroactive coverage. *See* D54-2_¶13; D54-3_¶5. Second, plaintiffs cannot establish that vacatur would automatically provide a state assurance of non-emergency transportation. The state plan does not provide for it. D74-1_6–9.

## B.    Any remand should have been without vacatur

Even if plaintiffs had standing to seek the approval's vacatur, the district court erred in ordering it and throwing into doubt Medicaid coverage for more than 300,000 Hoosiers. *See* D74-1_5. District courts are not required to vacate deficient agency actions. Rather, courts must decide between vacating and remanding without vacatur by carefully considering "the seriousness of the . . . deficiencies (and thus the extent of doubt whether the agency chose correctly)" and "the disruptive consequences of an interim change that may itself be changed." *Chamber*

57

*of Com. v. SEC*, 443 F.3d 890, 908 (D.C. Cir. 2006) (quotation omitted). Here, both considerations strongly support remand without vacatur.

>    1. **Any deficiencies in the Secretary's reasoning can be rehabilitated on remand**

The supposed deficiencies the district court identified primarily concern whether the Secretary offered an adequate explanation. D68_58 (describing the deficiency as "failure to adequately consider an objective of Medicaid"). As this Court held, remand without vacatur is "*generally appropriate* when 'there is at least a serious possibility that the [agency] will be able to substantiate its decision' given an opportunity to do so." *Radio-Television News Directors Ass'n v. FCC*, 184 F.3d 872, 888 (D.C. Cir. 1999) (emphasis added) (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 151 (D.C. Cir. 1993)). Indiana submits there is at least a "serious possibility" for the reasons stated above. Even the district court admitted those deficiencies may be "rehabilitate[d] . . . on remand." D68_58. And this Court has been especially wary of prejudging an agency's ability to rehabilitate its reasoning with respect to "complex and highly technical regulatory program[s] such as Medicare." *Shands Jacksonville Med. Ctr., Inc. v. Azar*, 959 F.3d 1113, 1118 (D.C. Cir. 2020) (cleaned up).

The only reason the district court gave for thinking that the Secretary could not rehabilitate his reasoning is that the district court had vacated Section 1115 waivers concerning work requirements in Arkansas, Kentucky, and New Hampshire. D68_58. But the Supreme Court granted certiorari in the work-requirement litigation despite the absence of a circuit split. *See Azar v. Gresham*, 141 S. Ct. 890 (2020); *see* Pet. for a Writ of Cert. at 16–17, *Becerra v. Gresham*, No. 20-37 (U.S. filed July 13, 2020) (principally seeking review because the decisions below were "incorrect"). That action signals there is at least a substantial possibility the work-requirement cases were wrongly decided. *See* Sup. Ct. R. 10 ("certiorari will be granted only for compelling reasons").

The district court, moreover, overlooked critical differences between the waivers at issue in the work-requirement litigation and the one here. First, this case concerns a waiver for a project that expanded Medicaid; the other cases involved waivers for newly added post-expansion requirements. *See* pp. 36–37, *supra*. Second, as even the district court admitted, the Secretary's reasoning here is a "step up" from the Secretary's reasoning in the work-requirement litigation. D68_48.

59

The district court erred in presuming the Secretary's approval for HIP rises or falls with his assessment of different projects and requirements.

### 2.  **Vacatur is highly disruptive**

Second, the disruptive effects of vacatur will be widespread and deeply felt by Hoosiers that rely on HIP for their healthcare. If the 2020 approval is vacated, Indiana will lose the full authority needed to operate HIP—a health plan that is exceptionally popular among those that it covers. SAR8250, 8252 (explaining that "86 percent of contributing members were satisfied with the program" and "95 percent" would "re-enroll if they lost coverage and became eligible again"). Whether one thinks that vacatur would endanger all benefits for the Medicaid expansion group or just the enhanced coverage provided by HIP Plus, *see* pp. 49–52, *supra*, vacating the approval adversely affects hundreds of thousands of Hoosiers that have long relied on HIP, D74-1_5. Hoosiers that enjoyed coverage and were exempt from unpredictable time-of-service copayments now face the prospect of fewer benefits and unwanted copayments. Only a partial stay is preventing the worst outcomes.

The district court largely dismissed coverage-related concerns as mere "inconvenience" on the theory that "premium requirements and

60

associated penalties have not been in effect since March 2020." D68_60. But the reason those requirements were paused is that Indiana temporarily agreed to suspend them during the COVID-19 public health emergency in exchange for enhanced temporary funding. *See id.* The court cited no state-law provision that permits contributions to be suspended forever.

The court, moreover, overlooked that vacatur impacts all aspects of HIP, not just POWER account contributions. Vacatur removes a long list of authorities unrelated to POWER account contributions. *See* SAR6851–6863. Consequently, the extensive changes that vacatur will force Indiana to make to its "eligibility systems and managed care plan contracts" at a time Indiana is focused on the complex task of unwinding measures dating from COVID-19, SAR2, amounts to much more than an "inconvenience." The disruption would be significant. *See id.*; D79-1_¶5 (anticipating that vacatur will "will require extensive system changes, revisions to existing vendor contracts, notice updates for Medicaid members, and a redesign of how capitation rates are paid").

The district court alternatively speculated that the federal government could require Indiana to modify its state plan to prevent

61

potential losses in coverage. D68_60. But there is no guarantee that Indiana and the federal government would be able to agree on a modification—which itself would be a complex, disruptive process— anytime soon. Seeking an amendment would require Indiana to assemble a comprehensive application package, 42 C.F.R. § 431.412(c), state and federal public notice periods, §§ 431.408, 431.416(b)–(d), the compilation of an administrative record, § 431.416(f), and potentially, legislative changes at the state level. Meanwhile, Indiana and its residents will continue feel the effects of vacatur.

The district court sought to minimize those effects by noting that "Indiana is not the first state to have to change course in the midst of active waivers of retroactive coverage and [non-emergency medical transportation]." D68_61. But none of those cases presented a situation where vacatur would threaten the entire Medicaid expansion project. *See Philbrick v. Azar*, 397 F. Supp. 3d 11, 32 (D.D.C. 2019), *aff'd*, No. 19-5293, 2020 WL 2621222 (D.C. Cir. May 20, 2020), *vacated and remanded*, 142 S. Ct. 1665 (2022) (explaining that the change vacated in *Stewart* had "yet to take effect," the disruption in *Gresham* related to a change was "largely administrative," and *Philbrick* concerned requirements "not

62

fully implemented"). In those cases, the court vacated waivers for new requirements on population *already covered* by Medicaid. Here, by contrast, vacatur undermines HIP's very existence. Simply put, any deficiencies of explanation are not so serious as to warrant making Indiana overhaul its system of coverage and endangering benefits for hundreds of thousands of Hoosiers.

## III. This Court Has Appellate Jurisdiction

Not only should this Court reverse the district court's decision, but it should do so now. Plaintiffs' and the government's arguments that the judgment below is non-final and non-appealable lack merit.

### A. The Rule 54(b) judgment is final and appealable

This Court has jurisdiction over "all final decisions from the district courts." 28 U.S.C. § 1291. Although a "final decision" is normally one that "ends the litigation on the merits," *St. Marks Place Hous. Co. v. U.S. Dep't of Hous. & Urban Dev.*, 610 F.3d 75, 79 (D.C. Cir. 2010), Federal Rule of Civil Procedure 54(b) permits courts to certify "partial" final judgments: ones "as to one or more, but fewer than all, claims or parties." The rule offers a "practical means" to appeal "without waiting for final decisions" on every distinct claim. *Attias v. Carefirst, Inc*, 969 F.3d 412, 416 (D.C.

63

Cir. 2020). To enter a Rule 54(b) judgment, all a court need do is "expressly determine[] that there is no just reason for delay." *Id.* That is what the district court did here. It vacated the Secretary's 2020 approval for HIP, issued a final judgment on "Count I of the supplemental complaint," and "expressly [found] pursuant to Rule 54(b) that there is no just reason for delay of appellate review." D71_1; *see* D67.

Plaintiffs and the government have argued that the judgment is nonetheless non-final because it remands to an agency. Doc. #2072962; Doc. #2074494_3. But review of a remand order "may be authorized by entry of a partial final judgment under Civil Rule 54(b)." C. Wright & A. Miller, *Federal Practice and Procedure* § 3914.32 (2d ed.). In fact, this Court has dismissed appeals from remand orders for want of a Rule 54(b) judgment, *see Watkins Law & Advoc., PLLC v. U.S. Dep't of Veterans Affs.*, No. 19-5341, 2020 WL 3002126, at *1 (D.C. Cir. Mar. 12, 2020) ("Absent entry of a partial final judgment under [Rule] 54(b), the . . . remand in the district court's order ordinarily renders the entire order non-final."); *Schaerr v. U.S. Dep't of Just.*, No. 20-5065, 2020 WL 5642042, at *1 (D.C. Cir. July 8, 2020) (dismissing appeal from order that "did not contain a 54(b) certification"), while other courts permit appeals

64

from remand orders accompanied by a proper judgment, *see Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 927 (9th Cir. 2008). The Rule 54(b) judgment suffices to give this Court jurisdiction.

## B.  Practical considerations reinforce that the judgment is final and appealable

Practical considerations reinforce that the judgment—which vacates an approval necessary for Indiana to operate HIP—is final and immediately appealable. It is black-letter law that "the requirement of finality is to be given a 'practical rather than technical construction.'" *Gillespie v. U.S. Steel Corp.*, 379 U.S. 148, 152 (1964). "[T]he most important competing considerations are 'the inconvenience and costs of piecemeal review on the one hand and the danger of denying justice by delay on the other.'" *Id.* at 152–53 (quoting *Dickinson v. Petroleum Conversion Corp.*, 338 U.S. 507, 511 (1950)). Those factors favor exercising jurisdiction here.

The dangers of piecemeal review are minimal. The district court's judgment resolves a distinct legal claim, vacates the Secretary's 2020 approval, and "affords full relief to Plaintiffs." D71_2; *see* D68. The judgment leaves nothing more for the court to do regarding the vacated 2020 approval. And immediate appellate review is desirable because it

65

will inform the standard applied on remand. *See PPG Indus., Inc. v. United States*, 52 F.3d 363, 365 (D.C. Cir. 1995) (explaining that agencies are bound on remand to execute "further action consistent with the corrected legal standards").

By contrast, the costs of delaying review are high for Indiana and its citizens. Delaying review will effectively remove any meaningful opportunity for Indiana to appeal the district court's order vacating the 2020 approval. Should the Secretary on remand issue a new decision regarding HIP, any further litigation in the district court—and "any appeal" from that litigation—will concern that new agency action. *Travis v. Sullivan*, 985 F.2d 919, 923 (7th Cir. 1993). Any claims or arguments concerning the previous approval will likely have been rendered moot. And if the Secretary declines to issue a waiver on remand, it is far from certain that any litigation would even occur in this Circuit. Indiana would be entitled to challenge the Secretary's new decision in an Indiana district court. *See* 28 U.S.C. § 1391(e)(1); *Brooks-LaSure*, 2022 WL 3581859, at \*6–8. It would "strain common sense" to treat the district court's order as non-final when doing so risks eliminating Indiana's

66

ability to challenge it altogether. *Limnia, Inc. v. U.S. Dep't of Energy*, 857 F.3d 379, 386 (D.C. Cir. 2017).

And even if a future decision by the Secretary gives rise to litigation in this Circuit and raises any legal issues presented by the current appeal—which is not guaranteed—Indiana will have forever lost a meaningful opportunity to argue the district court erred in vacating the 2020 approval as opposed to remanding without vacatur. *See Am. Great Lakes Ports Ass'n v Schultz*, 962 F.3d 510, 519 (D.C. Cir. 2020). Indiana and its citizens will have already been forced to endure (perhaps for years) the loss of authorities needed to operate HIP as designed.

Plaintiffs and the government invoke the general principle that remand orders are non-final, at least for private litigants. Doc. #2072962_4; Doc. #2074494_2–3. But that rule "is not absolute." *In re Long Distance Tel. Serv. Fed. Excise Tax Refund Litig.*, 751 F.3d 629, 633 (D.C. Cir. 2014). Generally, remand orders are not appealable because the parties will have an "opportunity to appeal after the proceedings on remand." *Lakes Pilots Ass'n, Inc. v. U.S. Coast Guard*, 359 F.3d 624, 625 (D.C. Cir. 2004). But this Court will allow aggrieved parties to appeal immediately where it is doubtful the parties will have a meaningful

67

opportunity to appeal later. *See Am. Great Lakes Ports Ass'n*, 962 F.3d at 515; *Limnia, Inc.*, 857 F.3d at 385.

The risk an order will go unreviewed is why this Court allows federal agencies to appeal a district court's remand order. Its concern is that an agency will be bound to "follow on remand the standard declared by the district court" and that the agency might not be able to appeal later. *Lakes Pilots Ass'n*, 359 F.3d at 625. In the same vein, this Court will permit private parties to appeal a remand order where the order "effectively terminate[s] the . . . action" because it may be their "only opportunity to appeal." *Am. Great Lakes Ports Ass'n*, 962 F.3d at 515.

That consideration is dispositive here. Even if Indiana wins a new approval for HIP—a process that could take years, *cf.* SAR1 (the prior review took two-and-a-half years)—any further litigation will concern the new approval. *See Travis*, 985 F.2d at 923. And if the Secretary declines to issue a new approval, any further litigation will likely concern that decision and may occur in another Circuit. Meanwhile, whatever the outcome on remand, Indiana and its citizens must endure the consequences of vacatur. Those practical considerations demonstrate that the judgment vacating the approval is final. And it is certainly

68

"relevant" that the district court deemed its judgment, *Am. Great Lakes Ports Ass'n*, 962 F.3d at 515, "final and immediately appealable," D71_2.

Finally, this Court should be especially reluctant to decline jurisdiction because Indiana, as a sovereign State, is not a "normal litigant," *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007), or a mere "outside party interested in the agency proceeding," Doc. #2074494_3. Rather, Indiana seeks to defend its sovereign interest in an agreement with the federal government concerning Medicaid expansion in Indiana. *See Armstrong v. Exceptional Child Cntr., Inc.*, 575 U.S. 320, 332 (2015) ("Spending Clause legislation like Medicaid 'is much in the nature of a contract."). The same rationales supporting States' "special solicitude" in the standing context support giving Indiana special solicitude here. *Massachusetts*, 549 U.S. at 518. The Court should reject efforts to keep Indiana from being heard on the merits about a critical approval undergirding essential Medicaid benefits that Indiana provides.

## CONCLUSION

This Court should reverse the district court's decision.

69

Respectfully submitted,

THEODORE E. ROKITA
Attorney General of Indiana

s/ James A. Barta
JAMES A. BARTA
Solicitor General

JENNA M. LORENCE
Deputy Solicitor General

CAROLINE M. BROWN
Brown & Peisch PLLC
1225 19th St. NW, Suite 700
Washington, D.C. 20036
(202) 499-4258
cbrown@brownandpeisch.com

Office of the Attorney General
302 W. Washington St.
Indianapolis, IN 46204
Phone: (317) 232-0709
James.Barta@atg.in.gov

*Counsel for Intervenor-Appellant*

70

## CERTIFICATE OF COMPLIANCE

This response complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) this brief contains 12,970 words.

This response complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: February 20, 2025

/s/ James A. Barta
JAMES A. BARTA

## CERTIFICATE OF SERVICE

I certify that, on February 20, 2025, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit through the appellate CM/ECF system, and the document is being served on all counsel of record via the CM/ECF system.

Dated: February 20, 2025

/s/ James A. Barta
JAMES A. BARTA