**[ORAL ARGUMENT NOT SCHEDULED]**

No. 24-5172

---

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

MONTE A. ROSE, JR., *et al.*,
*Plaintiffs-Appellees*,

v.

ROBERT F. KENNEDY, JR., *Secretary, United States Department of Health and Human Services, in his official capacity*, *et al.*,
*Defendants-Appellees*,

INDIANA FAMILY AND SOCIAL SERVICES ADMINISTRATION,
*Intervenor-Appellant.*

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

### BRIEF FOR FEDERAL APPELLEES

———————————

*Of Counsel:*

SEAN R. KEVENEY
*Acting General Counsel*

LENA YUEH
*Acting Associate General Counsel*

DAVID L. HOSKINS
*Deputy Associate General Counsel for Litigation*

GARRETT F. MANNCHEN
*Attorney*

*U.S. Department of Health and Human Services*

YAAKOV M. ROTH
*Acting Assistant Attorney General*

MICHAEL S. RAAB
MAXWELL A. BALDI
*Attorneys, Appellate Staff Civil Division, Room 7513 U.S. Department of Justice 950 Pennsylvania Avenue NW Washington, DC 20530 (202) 532-0211*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

**A.    Parties and Amici**

Plaintiffs-appellees are Monte A. Rose, Jr.; Chelsey Lang; and Emily Rames.

Defendants-appellees are Robert F. Kennedy, Jr., in his official capacity as Secretary of the U.S. Department of Health and Human Services; Mehmet Oz, in his official capacity as Administrator of the Centers for Medicare & Medicaid Services; the U.S. Department of Health and Human Services; and the Centers for Medicare & Medicaid Services.[*]

Intervenor-appellant is the Indiana Family and Social Services Administration.

No amici appeared in the district court.  To date, no amici have appeared in this Court.

---

[*] Secretary Kennedy and Administrator Oz have been automatically substituted for their predecessors.  *See* Fed. R. App. P. 43(c)(2).

**B.    Rulings Under Review**

Intervenor-appellant appeals from the memorandum opinion (Dkt. 68) and order (Dkt. 67) entered by the district court (Boasberg, C.J.) on June 27, 2024.  The opinion is not reported but is available at 2024 WL 3202342.

**C.    Related Cases**

This case has not previously been before this Court or any court other than the district court.  Counsel for the federal defendants-appellees are unaware of any related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

*/s/ Maxwell A. Baldi*
Maxwell A. Baldi

ii

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................v

GLOSSARY ...................................................................... xi

STATEMENT OF JURISDICTION ................................................. 1

STATEMENT OF THE ISSUES .................................................. 1

PERTINENT STATUTES AND REGULATIONS ....................................... 2

STATEMENT OF THE CASE ...................................................... 2

    A.    The Medicaid Program ....................................................2

    B.    The Healthy Indiana Plan ...............................................6

    C.    Prior Proceedings ....................................................13

SUMMARY OF ARGUMENT ......................................................17

STANDARD OF REVIEW ......................................................20

ARGUMENT ..............................................................20

I.    This Court lacks jurisdiction over this interlocutory appeal from a remand order. ......................................................20

II.    The Secretary adequately explained his decision to approve the HIP demonstration. ....................................................30

    A.    The Secretary's discretionary decision to approve a Section 1115 demonstration is subject to highly deferential review.............................................................31

    B.    The Secretary appropriately considered and addressed all relevant factors in approving Indiana's application......................35

C.      The district court erred in failing to consider the
        Secretary's approval of Indiana's demonstration as a
        whole. ...................................................................................49

CONCLUSION..............................................................................52

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                          **Page(s)**

*Aguayo v. Richardson,*
   473 F.2d 1090 (2d Cir. 1973) ..............................................................33, 34, 35, 48

*America First Legal Found. v. Gorman,*
   No. 23-5228, 2024 WL 410272 (D.C. Cir. Feb. 1, 2024) ...................................22

*American Great Lakes Ports Ass'n v. Schultz,*
   962 F.3d 510 (D.C. Cir. 2020) ............................................................................29

*American Haw. Cruises v. Skinner,*
   893 F.2d 1400 (D.C. Cir. 1990) .............................................................21, 22, 27

*American Soc'y for Testing & Materials v. Public.Resource.Org, Inc.,*
   896 F.3d 437 (D.C. Cir. 2018) ............................................................................31

*Attias v. CareFirst, Inc.,*
   969 F.3d 412 (D.C. Cir. 2020) .....................................................17, 24, 25, 26, 27

*Bauer v. FDIC,*
   38 F.4th 1114 (D.C. Cir. 2022) ...........................................................................20

*Becerra v. Gresham,*
   142 S. Ct. 1665 (2022) ........................................................................................13

*Bowen v. Massachusetts,*
   487 U.S. 879 (1988) ..............................................................................................3

*Building Industry Ass'n of Superior Cal. v. Babbitt,*
   161 F.3d 740 (D.C. Cir. 1998) ............................................................................26

*Citizens for Responsibility & Ethics in Washington v. FEC,*
   No. 18-5136, 2018 WL 5115542 (D.C. Cir. Sept. 19, 2018) .............................22

*C.K. v. New Jersey Dep't of Health & Human Servs.*,
   92 F.3d 171 (3d Cir. 1996) ...........................................................32, 42

*Cox v. Kijakazi*,
   77 F.4th 983 (D.C. Cir. 2023) ................................................................31

*FCC v. National Citizens Comm. for Broad.*,
   436 U.S. 775 (1978) ................................................................................35

*FCC v. Prometheus Radio Project*,
   592 U.S. 414 (2021) ................................................................................46

*Firestone Tire & Rubber Co. v. Risjord*,
   449 U.S. 368 (1981) ................................................................................21

*Georgia v. Tennessee Copper Co.*,
   206 U.S. 230 (1907) ................................................................................30

*Gresham v. Azar*,
   950 F.3d 93 (D.C. Cir. 2020), *vacated sub nom. Arkansas v. Gresham*,
   142 S. Ct. 1665 (2022) ...........................................................................43

*Harris v. McRae*,
   448 U.S. 297 (1980) ................................................................................43

*Harvey v. District of Columbia*,
   798 F.3d 1042 (D.C. Cir. 2015) ............................................................28

*Hudson v. FAA*,
   192 F.3d 1031 (D.C. Cir. 1999) ............................................................48

*Humane Soc'y of the U.S. v. Zinke*,
   865 F.3d 585 (D.C. Cir. 2017) ..............................................................48

*International Ladies' Garment Workers' Union v. Donovan*,
   722 F.2d 795 (D.C. Cir. 1983) ..............................................................35

*Lakes Pilots Ass'n v. U.S. Coast Guard,*
   359 F.3d 624 (D.C. Cir. 2004) ..............................................21, 23, 26, 29

*Limnia, Inc. v. U.S. Dep't of Energy,*
   857 F.3d 379 (D.C. Cir. 2017) ...........................................................29

*Massachusetts v. EPA,*
   549 U.S. 497 (2007) .........................................................................30

*Melinta Therapeutics, LLC v. FDA,*
   No. 22-5288, 2022 WL 19723218 (D.C. Cir. Dec. 1, 2022) .............................22

*Mohawk Indus., Inc. v. Carpenter,*
   558 U.S. 100 (2009) ....................................................................20, 28

*National Fed'n of Indep. Bus. v. Sebelius,*
   567 U.S. 519 (2012) .......................................................................3, 4

*National Wildlife Fed'n v. National Marine Fisheries Serv.,*
   524 F.3d 917 (9th Cir. 2008)...............................................................27

*New York State Dep't of Soc. Servs. v. Dublino,*
   413 U.S. 405 (1973) .....................................................................37-38

*Newfound Mgmt. Corp. v. Lewis,*
   131 F.3d 108 (3d Cir. 1997)................................................................25

*North Carolina Fisheries Ass'n v. Gutierrez,*
   550 F.3d 16 (D.C. Cir. 2008) ..................................................17, 21, 22

*Occidental Petroleum Corp. v. SEC,*
   873 F.2d 325 (1989).........................................................................21

*Pension Benefit Guar. Corp. v. LTV Corp.,*
   496 U.S. 633 (1990) ........................................................................48

*Pharmaceutical Research & Mfrs. of Am. v. Thompson,*
   362 F.3d 817 (D.C. Cir. 2004) ...........................................................38

*Pharmaceutical Research & Mfrs. of Am. v. Walsh*,
    538 U.S. 644 (2003) .................................................................3, 38

*Pueblo of Sandia v. Babbitt*,
    231 F.d 878 (D.C. Cir. 2000) ...............................................23, 28, 29

*Reytblatt v. U.S. Nuclear Regulatory Comm'n*,
    105 F.3d 715 (D.C. Cir. 1997) ....................................................49

*Rural Cellular Ass'n v. FCC*,
    588 F.3d 1095 (D.C. Cir. 2009) ..................................................35

*Schaerr v. U.S. Dep't of Justice*,
    No. 20-5065, 2020 WL 5642042 (D.C. Cir. July 8, 2020).................26

*Schieber v. United States*,
    77 F.4th 806 (D.C. Cir. 2023), *cert. denied*, 144 S. Ct. 688 (2024) ................35

*Sears, Roebuck & Co. v. Mackey*,
    351 U.S. 427 (1956) ...........................................................24, 27

*Sierra Club v. U.S. Dep't of Agric.*,
    716 F.3d 653 (D.C. Cir. 2013) .............................................21, 22, 23

*Travis v. Sullivan*,
    985 F.2d 919 (7th Cir. 1993)....................................................29

*United States v. Philip Morris USA Inc.*,
    686 F.3d 839 (D.C. Cir. 2012) ..................................................20

*U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*,
    513 U.S. 18 (1994) ...............................................................43

*Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*,
    435 U.S. 519 (1978) .............................................................48

*Watkins Law & Advocacy, PLLC v. U.S. Dep't of Veterans Affairs*,
    No. 19-5341, 2020 WL 3002126 (D.C. Cir. Mar. 12, 2020)............................26

*Webster v. Doe*,
   486 U.S. 592 (1988) ........................................................................31

**Statutes:**

Patient Protection and Affordable Care Act,
   Pub. L. No. 111-148, 124 Stat. 119 (2010) ........................................4
      § 4108, 124 Stat. at 561–63........................................................44

Social Security Act,
   42 U.S.C. § 1315(a) ................................................................31, 34, 49
   42 U.S.C. § 1315(a)(1).............................................................5, 6, 31
   42 U.S.C. § 1315(a)(2)(A) ..............................................................6
   42 U.S.C. § 1315(d)(2)(C) ..............................................................34
   42 U.S.C. § 1396 *et seq.* .................................................................2
      42 U.S.C. § 1396-1 ....................................................................43
      42 U.S.C. § 1396a......................................................................5, 34
      42 U.S.C. § 1396a(a).....................................................................
      42 U.S.C. § 1396a(a)-(b)...............................................................3
      42 U.S.C. § 1396a(a)(10) ..............................................................3
      42 U.S.C. § 1396a(a)(17) ..............................................................3
      42 U.S.C. § 1396a(a)(19) ..............................................................44
      42 U.S.C. § 1396a note .................................................................44

5 U.S.C. §§ 702–705 ...........................................................................1

28 U.S.C. § 1291 ...............................................................1, 16, 20, 30

28 U.S.C. § 1331 ..................................................................................1

28 U.S.C. § 1361 ..................................................................................1

28 U.S.C. § 1391(e)(1) ......................................................................28

**Regulation:**

42 C.F.R. § 431.416(d)(2)...........................................................34, 36

**Rules:**

Fed. R. App. P. 4(a)(1)(B) ................................................................1

Fed. R. Civ. P. 54(b) ..........................................................1, 16, 24

Fed. R. Civ. P. 58(d) ......................................................................16

D.D.C. LCvR 40.5(a)(4) ................................................................28

D.D.C. LCvR 40.5(c)(1) ................................................................28

**Legislative Materials:**

111 Cong. Rec. (1965):
 p. 7364 ............................................................................45
 p. 7430 ............................................................................45

H.R. Doc. No. 89-44 (1965) ..........................................................44

H.R. Rep. No. 89-213 (1965) ........................................................45

S. Rep. No. 89-404 (1965) ............................................................45

**Other Authorities:**

Kaiser Comm'n on Medicaid & the Uninsured, *A Look at Section 1115 Medicaid Demonstration Waivers Under the ACA: A Focus on Childless Adults* (Oct. 2013), https://perma.cc/RT2T-SVUM ................38-39

*Medicaid Program; Review and Approval Process for Section 1115 Demonstrations*, 77 Fed. Reg. 11,678 (Feb. 27, 2012) ............................32, 42

Karl Popper, *The Logic of Scientific Discovery* (1959)......................................42

15A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* (3d ed., June 2024 update)...............................................24

# GLOSSARY

| | |
|---|---|
| ACA | Patient Protection and Affordable Care Act |
| APA | Administrative Procedure Act |
| CMS | Centers for Medicare & Medicaid Services |
| HIP | Healthy Indiana Plan |
| HHS | U.S. Department of Health and Human Services |
| POWER Account | Personal Wellness and Responsibility Account |

## STATEMENT OF JURISDICTION

Plaintiffs invoked the jurisdiction of the district court under 28 U.S.C.

§§ 1331 and 1361 and 5 U.S.C. §§ 702–705.  Supplemental Complaint,

<Dkt. 50-1/4>.  The district court entered judgment for plaintiffs on Count I

of their complaint and remanded to the agency on June 27, 2024.  Order,

<Dkt. 67/1>.  The district court certified that judgment under Federal Rule

of Civil Procedure 54(b) on July 10, 2024.  Order, <Dkt. 71/1–2>.

Intervenor-appellant filed a notice of appeal on July 12, 2024—within 60 days

of the judgment.  Notice of Appeal, <Dkt. 72/1>; *see* Fed. R. App. P.

4(a)(1)(B).

Intervenor-appellant asserts jurisdiction in this Court under 28 U.S.C.

§ 1291.  Br. 4.  Appellate jurisdiction is contested.  *See infra* pp. 20–30.

## STATEMENT OF THE ISSUES

Section 1115 of the Social Security Act authorizes the Secretary of

Health and Human Services to waive statutory requirements for Medicaid

programs to facilitate experimentation with approaches that depart from the

existing Medicaid model.  The State of Indiana sought approval for a

demonstration project that would offer two tiers of benefits, require payment

of monthly premiums to access the tier with enhanced benefits, charge co-

payments for services provided as part of the tier with more basic benefits, remove retroactive coverage, and eliminate assurances of non-emergency medical transportation.  The Secretary approved the proposed project. Three Hoosiers who receive Medicaid benefits sued.  The district court held that the Secretary had not adequately explained his decision, vacated the approval, and remanded to the agency for further proceedings.  Indiana, which intervened in the litigation to defend the approval, appealed; the federal defendants did not.

The questions presented are:

I.  Whether this Court lacks jurisdiction to consider this appeal from an order remanding an agency's action for further explanation.

II.  Whether the district court erred in vacating the Secretary's discretionary approval of Indiana's Section 1115 demonstration.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    The Medicaid Program

1.  The Medicaid program, enacted in 1965 as Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*, is "a cooperative endeavor in which the

Federal Government provides financial assistance to participating States to aid them in furnishing health care to needy persons," *Bowen v. Massachusetts*, 487 U.S. 879, 883 (1988) (quotation marks omitted).  To participate in Medicaid and receive federal funding, a State must submit a plan for medical assistance that meets various statutory requirements, which must be approved by the Secretary.  42 U.S.C. § 1396a(a)–(b).  The State's plan, once approved, defines the categories of persons who are eligible for benefits under the plan and the types of medical services that are covered.  *Id.* § 1396a(a)(10), (17).  By 1982, every State had chosen to participate in Medicaid.  *See National Fed'n of Indep. Bus. v. Sebelius* (*NFIB*), 567 U.S. 519, 542 (2012) (lead opinion).

Since Medicaid's enactment in 1965, federal law has required participating States to cover specified benefits for specified populations, while giving States the option to cover certain additional populations and additional benefits.  *See* 42 U.S.C. § 1396a(a)(10); *Pharmaceutical Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 650–51, 51 n.4 (2003).  Under the traditional Medicaid program, state coverage was mandatory for discrete categories of low-income individuals: persons who are disabled or blind, the elderly, children, parents of dependent children, and pregnant women.

*NFIB*, 567 U.S. at 575 (lead opinion).  Outside these categories, there was no mandatory coverage of most childless adults, and States typically did not offer such coverage.  *Id.*

As enacted, the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010) (ACA), would have required States to expand their Medicaid programs by 2014 to cover all individuals under the age of 65 with incomes below 133% of the federal poverty line.  *NFIB*, 567 U.S. at 576 (lead opinion).  In *NFIB*, however, the Supreme Court concluded that the ACA's adult-eligibility expansion was in essence a new program and ruled that Congress could not condition a State's traditional Medicaid funding on its compliance with the ACA's expansion requirement. *Id.* at 585; *id.* at 671–89 (Scalia, Kennedy, Thomas, and Alito, JJ., dissenting). The effect of that ruling was to make state coverage of the ACA's adult expansion population optional.  *See id.* at 585 (lead opinion) (holding that the Department of Health and Human Services (HHS) cannot "withdraw existing Medicaid funds for failure to comply with the requirements set out in the expansion").

Accordingly, following *NFIB*, as States were evaluating whether to participate in the ACA's expansion of adult eligibility, HHS acknowledged

4

that coverage of the expansion population was optional and that States have "flexibility to start or stop the expansion."  *See* Letter from Anne Marie Costello, Acting Deputy Adm'r & Dir., Ctrs. for Medicare & Medicaid Servs. (CMS), to Allison Taylor, Medicaid Dir., Ind. Family & Soc. Servs. Admin. (Oct. 26, 2020) (Demonstration Approval), <SAR 1556 n.2> (quoting CMS, HHS, *Frequently Asked Questions on Exchanges, Market Reforms, and Medicaid* 11 (Dec. 10, 2012), https://perma.cc/35HC-3RQP).

2.  Although Medicaid state plans generally must comply with the requirements set forth in 42 U.S.C. § 1396a, the statute includes a mechanism for testing variations from the default statutory model that might advance the statute's objectives.  That mechanism, contained in Section 1115 of the Social Security Act, empowers the Secretary to authorize such an experiment and to waive otherwise-applicable statutory requirements as he deems necessary to facilitate the project.  42 U.S.C. § 1315(a)(1).

Section 1115 provides that, "[i]n the case of any experimental, pilot, or demonstration project which, in the judgment of the Secretary, is likely to assist in promoting the objectives of " (as relevant here) Title XIX of the Social Security Act—*i.e.*, the Medicaid statute—"in a State or States . . . the Secretary may waive compliance with any of the requirements of section . . .

1396a of [Title 42] . . . to the extent and for the period he finds necessary to enable such State or States to carry out such project." 42 U.S.C. § 1315(a)(1). In addition, Section 1115 authorizes the Secretary to treat state expenditures for an approved demonstration project as expenditures that are eligible for federal funding even though they would not otherwise qualify. *Id.* § 1315(a)(2)(A).

### B.    The Healthy Indiana Plan

1. In 2007, CMS approved a Section 1115 demonstration project, known as the Healthy Indiana Plan (HIP), which expanded health care coverage to certain low-income adults in Indiana who were not then otherwise eligible for coverage under the Medicaid Act. Ind. Family & Soc. Servs. Admin., *Renewal Request for the Healthy Indiana Plan (HIP) Section 1115 Waiver* (Jan. 31, 2020) (Extension Request), <SAR 8239>. At bottom, HIP combined a high-deductible insurance plan with a Personal Wellness and Responsibility Account (POWER Account), which functioned similarly to a health savings account. *Id.*, <SAR 8250>. The State (and often beneficiaries) paid money into POWER Accounts, which were used to fund deductibles. *Id.*, <SAR 8250>. The first iteration of HIP included a monthly premium requirement; termination of coverage and a 12-month non-

6

eligibility period for enrollees who did not pay their premiums or who did not complete the annual redetermination process by the deadline; elimination of retroactive coverage; and elimination of the assurance to provide non-emergency medical transportation. *Id.*, <SAR 8264>.

When Congress enacted the ACA, Indiana selected HIP as the mechanism to expand its Medicaid program. Extension Request, <SAR 8239>. Effective February 2015, the Secretary approved Indiana's proposal to conduct its demonstration for three years as "HIP 2.0." *Id.*, <SAR 8240>. That approval was later amended and extended to expire at the end of 2020. *Id.*, <SAR 8241>. HIP 2.0 resulted in Medicaid coverage for the ACA expansion population in Indiana—a total of more than 400,000 individuals. *Id.*, <SAR 8240>.

HIP 2.0 comprised two benefit plans. The standard plan, known as HIP Basic, covered all mandatory Medicaid benefits except that it did not offer retroactive coverage and that non-emergency medical transportation was offered only to pregnant women and the medically frail. Extension Request, <SAR 8253>. Most enrollees in HIP Basic had to make small co-payments of $4 or $8 when they received most care and $75 when they received inpatient services; they did not pay premiums. *Id.*, <SAR 8253>.

7

The enhanced benefit plan, known as HIP Plus, provided all of the HIP Basic benefits in addition to other coverage including dental and vision. *Id.*, <SAR 8253>. HIP Plus enrollees paid a monthly amount in to their POWER Accounts of between $1 and $20 per month, based on their income. *Id.*, <SAR 8252>. They did not pay copayments, except for an $8 charge for non-emergency visits to emergency rooms. *Id.*, <SAR 8253>.

HIP 2.0 was available to the ACA expansion population, though not everyone was eligible for both the Basic and Plus plans. Beneficiaries who chose to make monthly payments were enrolled in HIP Plus. Extension Request, <SAR 8253>. Hoosiers with incomes at or below the federal poverty limit had the option to enroll either in HIP Basic or in HIP Plus. *Id.*, <SAR 8253>. If a HIP Plus enrollee who met that income threshold stopped making payments for 60 days, she would be transferred to HIP Basic. *Id.*, <SAR 8253–54>. If a beneficiary with income above the federal poverty limit stopped making payments for 60 days, she would be disenrolled from HIP and would be ineligible for HIP coverage for six months absent a qualifying life event.[2] *Id.*, <SAR 8254>.

---

[2] Indiana has indicated that it does not plan to reinstate the non-eligibility policy. Letter from Daniel Tsai, Deputy Adm'r & Dir., CMS, to

*Continued on next page.*

8

In 2018, the Secretary extended Indiana's HIP demonstration project for three years. Extension Request, <SAR 8241>. As part of this extension, the Secretary authorized Indiana to increase premiums for certain tobacco users, to change the way it calculated premiums, to add chiropractic benefits to HIP Plus, to reimpose a non-eligibility period for beneficiaries who did not complete the annual redetermination process by the deadline, and to create a program to address substance use disorders for all Medicaid beneficiaries. *Id.*, <SAR 8241>.

2. In 2020, Indiana sought a further extension of its demonstration project. Extension Request, <SAR 8234>. Indiana simultaneously sought to extend the existing provisions of HIP 2.0, to obtain new authority to modify periodically the premiums it charged for HIP Plus, to expand the availability of treatment options for substance use disorder, and to create new treatment options for serious mental illness. *See id.*, <SAR 8279>. "[I]n accordance with section 1115(a) of the" Social Security Act, the Secretary approved the substance use disorder and serious mental illness

---

Cora Steinmetz, Medicaid Dir., Ind. Family & Soc. Servs. Admin. (Dec. 22, 2023) (2023 Letter), <SAR 0003>.

provisions for five years and all other provisions for 10 years.  Demonstration Approval, <SAR 1554–55>.

As part of his approval, the Secretary found that HIP "is likely to assist in promoting the objectives of the Medicaid program."  Demonstration Approval, <SAR 1560>.  The Secretary explained that HIP would expand access to healthcare coverage by enabling recipients to access "short-term residential services" to treat substance use disorders.  *Id.*, <SAR 1560–61>. He found that the demonstration would enable access to new forms of treatment for substance use disorder including "residential treatment, crisis stabilization and [inpatient] withdrawal management services."  *Id.*, <SAR 1561>.  An interim evaluation of the less-expansive version of the program "provide[d] preliminary promising evidence for [its] usefulness," with increased rates of treatment and decreased rates of post-emergency-room follow-up visits for beneficiaries.  *Id.*, <SAR 1561>.  The Secretary explained HIP would similarly expand access to treatment for serious mental illness in short-term residential settings.  *Id.*, <SAR 1560–61>.  He found that HIP had been designed to:

> increase identification, initiation, and engagement of Medicaid beneficiaries with [serious mental illness], improve access to community-based services to address the chronic mental health care in the community following episodes of acute care in

10

> hospitals, and reduce inappropriate or preventable utilization of emergency departments and inpatient hospital settings through improved access to services through a continuum of care in an additional setting that, absent this demonstration, would be ineligible for Medicaid reimbursement for most Medicaid enrollees.

*Id.*, <SAR 1561>.

While noting that he was not obligated to provide written responses to public comments, the Secretary voluntarily "address[ed] some of the central issues raised by the commenters." Demonstration Approval, <SAR 1566>. The Secretary specifically addressed concerns that the requirements HIP imposes on beneficiaries could lead to loss of coverage. He noted that allowing Indiana to charge premiums for HIP Plus could result in disenrollment, but, because the data indicate that "the number and proportion of individuals disenrolled due to non-payment decreased over time," it follows that he considered that any risk of coverage loss would be more than offset by the demonstrations' benefits. *See id.*, <SAR 1570>; *see also* Lewin Grp., Inc., *Healthy Indiana Plan Interim Evaluation Report* (Apr. 29, 2020) (HIP Interim Evaluation Report), <SAR 4755> ("The disenrollment rate decreased from an average of 3.1% in 2016 to an average of 2.2% in 2018 . . . ." (citations omitted)). The Secretary similarly explained that he believed restricting non-emergency medical transportation would not

result in decreased coverage, pointing to record evidence that the availability of non-emergency medical transportation made no statistically significant difference in whether beneficiaries missed appointments. Demonstration Approval, <SAR 1562>; *see* Lewin Grp., Inc., *Indiana HIP 2.0: Evaluation of Non-Emergency Medical Transportation (NEMT) Waiver* (Nov. 2, 2016), <SAR 6049>. And he noted that waiving the retroactive coverage requirement may lead to only a small decrease in coverage because the existing program was not widely used, Demonstration Approval, <SAR 1564–65, 1564 n.9>, so, again, it follows that he considered any potential coverage losses would be more than offset by the demonstration's significant benefits.

The Secretary also explained why HIP would help promote the fiscal sustainability of Medicaid in Indiana. He pointed out that HIP would likely incentivize beneficiaries to enroll quickly, obtain preventative care, and treat or manage chronic illnesses. Demonstration Approval, <SAR 1561–62>. He also noted that HIP would test ways to encourage beneficiaries to become more savvy and effective consumers of healthcare, to the benefit of their own health and to Indiana's bottom line. *Id.*, <SAR 1563–64>.

Indiana also requested a waiver to allow it to impose a community engagement requirement for certain participants to be eligible for HIP. *See* Extension Request, <SAR 8256–60> (proposing that some participants be required to work, seek work, volunteer, study, or complete other similar activities for 20 hours per week). While the Secretary conditionally approved those requirements, they never went into effect. *See* Demonstration Approval, <SAR 1576> (granting approval conditioned on "the Supreme Court issuing a decision in *Azar v. Gresham*, No. 20-37 that legally authorizes this element of the demonstration"); *see also Becerra v. Gresham*, 142 S. Ct. 1665 (2022) (vacating district court judgment as moot under *Munsingwear* doctrine).

3. Following a review of the 2020 approval of Indiana's demonstration, in 2023 the Secretary determined that, despite some concerns, he would take no action on the demonstration. 2023 Letter, <SAR 0001–11>. The approval thus remained effective as issued.

## C.    Prior Proceedings

1. Three Hoosiers sued under the Administrative Procedure Act (APA) to challenge the Secretary's 2020 approval as well as the 2023 Letter. Supplemental Complaint, <Dkt. 50-1/34–39>. They raised five counts in

their operative complaint.  *Id.*, <Dkt. 50-1/34–39>.  Count I asserted that

the Secretary's approval of the HIP 2.0 project as a whole was unlawful.

Count II asserted that the Secretary's issuance of the 2023 Letter was

unlawful.  Counts III, IV, and V asserted, respectively, that the approval of

the demonstration was unlawful in authorizing Indiana to charge premiums,

not to provide non-emergency medical transportation, and not to provide

retroactive coverage.  The Indiana agency that administers the State's

Medicaid program intervened to defend the approval.  Minute Order,

<10/15/19 JA#>.

Concluding that the Secretary had failed to adequately consider and

explain all relevant factors in approving the demonstration, the district court

granted summary judgment to plaintiffs on Count I, vacated the approval,

and remanded to the agency for further proceedings.  Order, <Dkt. 67/1>;

Memorandum Opinion, <Dkt. 68./1–66>.

The district court did not "question the agency's predictive judgments

or evaluate the evidence before it" about whether the demonstration would

advance the goals of Medicaid; rather it "simply looked for—and [was]

unable to find—what the APA requires: a reasoned explanation that

considers the factors relevant to the agency's decision."  Memorandum

14

Opinion, <Dkt. 68/55>.  Specifically, the district court held that the Secretary had not explained why he disagreed with public comments asserting that the demonstration would prevent individuals from maintaining coverage, *id.*, <Dkt. 68/36–40>, had not explained why the relevant Indiana program would promote coverage, *id.*, <Dkt. 68/40–43>, and had not explained why the demonstration would save substantial costs, *id.*, <Dkt. 68/52–55>.  Accordingly, the district court held that the Secretary's approval of the demonstration was arbitrary and capricious.  *Id.*, <Dkt. 68/48, 56>.

As the district court "d[id] not rule out the possibility that HHS could indeed rehabilitate the approval on remand," Memorandum Opinion,<Dkt. 68/58>, it vacated and remanded the agency's 2020 approval of the demonstration, *id.*, <Dkt. 68/63–64>; *see also* Order, <Dkt. 67/1>.  The district court declined to reach several other claims raised by plaintiffs (including their challenge to the 2023 Letter) because it concluded that resolution of plaintiffs' overall challenge to the 2020 approval afforded them complete relief.  Memorandum Opinion,<Dkt. 68/21>.

2.  Indiana sought clarification from the district court about the scope of its order.  *See* Motion for Entry of Judgment, <Dkt. 69/1–4>.  Indiana asserted that it was unclear whether the district court's order was a

"judgment" and whether the district court's order had disposed of all plaintiffs' claims. *Id.*, <Dkt. 69/2>. It asked the district court either to state that it had finally resolved all claims or to issue a separate judgment on the claim it had resolved. *Id.*, <Dkt. 69/2>; *see* Fed. Rs. Civ. P. 54(b), 58(d).

In response, the district court certified under Rule 54(b) that it had finally resolved the first count in plaintiffs' complaint and found "pursuant to Rule 54(b) that there is no just reason for delay of appellate review of that Order and its accompanying Memorandum Opinion." *See* Order, <Dkt. 71/1>.

Invoking this Court's jurisdiction under 28 U.S.C. § 1291, Indiana then appealed. Notice of Appeal, <Dkt. 72/1>.

3. The parties jointly sought, and the district court granted, a partial stay of its decision pending this appeal and any remand to the agency. *See* Order, <Dkt. 83/1>; Minute Order, <10/7/24 JA#> (modifying stay to continue during remand to the agency). Therefore, except for Indiana's authority to collect premiums for HIP Plus, the Secretary's approval will remain in effect until the resolution of any remanded proceedings before the agency. *See* Order, <Dkt. 83/1>; Joint Status Report, <Dkt. 81/1–2>.

## SUMMARY OF ARGUMENT

I.  This Court lacks appellate jurisdiction.  "It is black letter law that a district court's remand order is not normally 'final' for purposes of appeal under 28 U.S.C. § 1291."  *North Carolina Fisheries Ass'n v. Gutierrez*, 550 F.3d 16, 19 (D.C. Cir. 2008).  By definition, a remand order does not finally resolve the parties' claims but rather invites further proceedings before the agency.  Here, the district court sent proceedings back to HHS for a further explanation of the Secretary's waiver decision.  And the limited exception permitting a federal agency to appeal from such an order does not apply because the federal government declined to appeal and instead was willing to try to bolster the explanation for its action.

Indiana's resort to Rule 54(b) is of no moment because a Rule 54(b) certification cannot render final an interlocutory order.  *See Attias v. CareFirst, Inc.*, 969 F.3d 412, 417 (D.C. Cir. 2020).  And its arguments for practical finality rely on features present in every non-appealable remand order and on doctrinal exceptions plainly not applicable here.  Accordingly, this appeal should be dismissed.

17

II.  If this Court reaches the merits, it should vacate and remand the

district court's erroneous judgment.  The Secretary properly explained his

discretionary judgment to approve Indiana's Section 1115 demonstration.

A.  The language of Section 1115 gives the Secretary broad discretion

to approve a demonstration project and does not require him to explain that

decision.  This Court properly applies only a deferential form of arbitrary

and capricious review appropriate for such predictive judgments.  This model

fits with the experimental nature of Section 1115 projects.  A project's

hypothesis may be proven or rejected, but either way the federal

government and the States gain valuable information.  In approving these

experiments, the Secretary does not know in advance whether they will

succeed and is not required to have substantial evidence that they will attain

their goals.

B.  Nevertheless, the Secretary fully considered the record and

adequately explained his decision.  The Secretary specifically determined

that HIP was likely to assist in promoting coverage.  He pointed to both the

substance use disorder and serious mental illness components of HIP, both

of which undoubtedly expand access to care.  He also explained why HIP

would improve the fiscal sustainability of Indiana's social safety net, which

18

would allow the State to allocate limited funds towards expanding benefits. The Secretary also considered the possibility that each of the contested elements of the demonstration would decrease coverage and balanced that concern against the benefits he expected from the HIP demonstration. These judgments—and the explanations the Secretary gave—are wholly consistent with the experimental nature of the demonstration.

The district court erred in considering only the HIP program's impact on healthcare coverage, ignoring other mechanisms through which HIP can further Medicaid's purpose of promoting public health. As the Secretary also explained, the HIP demonstration was likely to improve health outcomes for beneficiaries, redounding both to their benefit and the benefit of Indiana's fisc.

C.  The district court further erred in excluding from its analysis two critical HIP features that indisputably expand the availability of coverage. As the Secretary made clear in his approval, the HIP project includes programs to expand coverage for people with substance use disorder and serious mental illness. In determining that the challenged demonstration does not expand access to coverage, the district court disregarded those elements of the HIP program and then faulted the Secretary for relying on

19

them to explain his approval of the demonstration. That was error. In granting the waiver, the Secretary permissibly evaluated the totality of the proposed demonstration and relied on Indiana's expansion of access to treatment for people with serious mental illness and for substance use disorder.

Because the Secretary provided an adequate basis to understand his approval of the HIP demonstration, the district court erred in vacating it.

## STANDARD OF REVIEW

This Court reviews de novo a district court's grant of summary judgment. *Bauer v. FDIC*, 38 F.4th 1114, 1121 (D.C. Cir. 2022).

## ARGUMENT

### I.    This Court lacks jurisdiction over this interlocutory appeal from a remand order.

1. This Court has jurisdiction over appeals from "final decisions of the district court[ ]." 28 U.S.C. § 1291. A decision is final when it ends the litigation on the merits. *United States v. Philip Morris USA Inc.*, 686 F.3d 839, 846 (D.C. Cir. 2012). The final-judgment rule reflects longstanding policy against "piecemeal, prejudgment appeals," which "undermine[ ] 'efficient judicial administration.'" *Mohawk Indus., Inc. v. Carpenter*,

20

558 U.S. 100, 106 (2009) (quoting *Firestone Tire & Rubber Co. v. Risjord*,

449 U.S. 368, 374 (1981)).

      "It is black letter law that a district court's remand order is not

normally 'final' for purposes of appeal under 28 U.S.C. § 1291."

*North Carolina Fisheries Ass'n v. Gutierrez*, 550 F.3d 16, 19 (D.C. Cir.

2008). A remand order "leaves the core dispute unresolved[ ] and simply

turns it back for further proceedings by the agency." *American Haw.

Cruises v. Skinner*, 893 F.2d 1400, 1403 (D.C. Cir. 1990) (per curiam).

Although there is a limited exception permitting "the agency to which the

case is remanded" to appeal immediately from a remand order, that path is

not available to other parties. *Lakes Pilots Ass'n v. U.S. Coast Guard*,

359 F.3d 624, 625 (D.C. Cir. 2004) (quoting *Occidental Petroleum Corp. v.

SEC*, 873 F.2d 325, 330 (1989)) (explaining that the rule is asymmetrical

because an agency lacks the ability to appeal after the remanded

proceedings). Instead, an outside party interested in the agency proceeding

that is "dissatisfied with the action on remand may still challenge the

remanded proceedings—as well as the remand order requiring them—after

the proceedings are complete." *Sierra Club v. U.S. Dep't of Agric.*, 716 F.3d

653, 657 (D.C. Cir. 2013).

This Court thus routinely dismisses appeals from district court orders that remand agency actions for further proceedings. *See, e.g.*, *North Carolina Fisheries*, 550 F.3d at 19; *American Haw. Cruises*, 893 F.2d at 1403; *America First Legal Found. v. Gorman*, No. 23-5228, 2024 WL 410272, at *1 (D.C. Cir. Feb. 1, 2024) (per curiam) (unpublished); *Melinta Therapeutics, LLC v. FDA*, No. 22-5288, 2022 WL 19723218, at *1 (D.C. Cir. Dec. 1, 2022) (per curiam) (unpublished); *Citizens for Responsibility & Ethics in Washington v. FEC*, No. 18-5136, 2018 WL 5115542, at *1 (D.C. Cir. Sept. 19, 2018) (per curiam) (unpublished). This rule applies with equal force to non-federal parties that have intervened to *defend* the challenged agency action. *See Sierra Club*, 716 F.3d at 656–58 (applying rule in that posture).

The district court expressly remanded this matter to HHS for further proceedings. *See* Order, <Dkt. 67/1>; *see also* Memorandum Opinion, <Dkt. 68/63–64>. It did not resolve the "core dispute" between the parties. *American Haw. Cruises*, 893 F.2d at 1403. Instead, it determined that the agency had not adequately explained its decision, Memorandum Opinion, <Dkt. 68/55>, and it expressly held open the possibility that HHS could "rehabilitate [its] approval [of the demonstration] on remand," *id.*, <Dkt.

22

68/58>.  On remand, HHS will reevaluate Indiana's various requests for waivers from statutory Medicaid requirements.  Thus, as the remand order contemplates further proceedings within the discretion of HHS, it is an interlocutory rather than final order.  *Cf. Pueblo of Sandia v. Babbitt*, 231 F.3d 878, 881 (D.C. Cir. 2000) (articulating a limited exception to non-finality of remand orders when court remands for "solely 'ministerial' proceedings").

Indiana's rights are adequately protected by the remand order.  *See Lakes Pilots Ass'n*, 359 F.3d at 625.  If, on remand, the Secretary reaches the same conclusion and approves the HIP demonstration, Indiana will have no need to appeal.  And if CMS reaches the opposite conclusion, Indiana can seek relief from the district court and, if necessary, can file a single appeal from final judgment.  The inability to appeal now thus will not compromise Indiana's ability to obtain review.  But it may avoid the need for appellate review altogether and, in any event, will avoid piecemeal appeals.  *See Sierra Club*, 716 F.3d at 657.  Therefore, this appeal should be dismissed for lack of jurisdiction.

2.  The district court's resolution of Indiana's Rule 54(b) motion does not render its remand order final.

"Rule 54(b) is designed to adapt appeal timing to the specific needs of particular multiclaim and multiparty litigation without losing the general advantages of the final judgment rule."  15A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3914.7.2 (3d ed., June 2024 update).  In a multiclaim suit, it permits a district court to "direct entry of a final judgment as to one or more, but fewer than all, claims" if the district court "expressly determines that there is no just reason for delay[ing]" an appeal.  Fed. R. Civ. P. 54(b).

For "an otherwise interlocutory order to be certified as a final judgment," three requirements must be met:  "(1) the order must resolve a distinct 'claim for relief'; (2) the order must be 'final' with respect to that claim; and (3) the district court must permissibly determine that there is 'no just reason for delay' in entering judgment." *Attias v. CareFirst, Inc.*, 969 F.3d 412, 417 (D.C. Cir. 2020).  Rule 54(b) "'does not relax the finality required of each decision' by section 1291." *Id.* at 416 (quoting *Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 435 (1956)).  If a district court "certifies a matter that does not involve the 'final' disposition of an entire 'claim,'" then this Court must dismiss the appeal. *Id.* at 417.

24

Here, because the order remanding proceedings to HHS is not a final order, it cannot be rendered immediately appealable by a Rule 54(b) certification. *See Attias*, 969 F.3d at 417; *Newfound Mgmt. Corp. v. Lewis*, 131 F.3d 108, 112 (3d Cir. 1997) ("Finality under Rule 54(b) is synonymous with that required under 28 U.S.C. § 1291.").

The district court's Rule 54(b) certification is not to the contrary. Indiana sought certification, noting that the court's order resolving the cross-motions for summary judgment addressed only Count I and not "Counts II through V of plaintiffs' supplemental complaint." Motion for Entry of Judgment, <Dkt. 69/1>. Indiana thus asked that "if the [district c]ourt understands its opinion and order to adjudicate Count I of plaintiffs' supplemental complaint and not the remaining counts," it "enter a separate judgment on Count I and expressly determine that there is no just reason to delay its entry." *Id.*, <Dkt. 69/2> (cleaned up). The district court made such a finding. Order, <Dkt. 71/1>. Neither Indiana nor the district court addressed the interlocutory nature of a remand order. And that absence is neither surprising nor relevant, because, had the federal government appealed, the district court's order would have confirmed that such an appeal could be taken from an order resolving a single claim in plaintiffs' complaint.

25

*See Lakes Pilots Ass'n*, 359 F.3d at 625.  As the federal government did not appeal, however, the remand order remains interlocutory.  To the extent the district court's Rule 54(b) order suggests otherwise, that determination does not bind this Court.  *See Attias*, 969 F.3d at 417 (dismissing appeal despite Rule 54(b) certification).

3.  Indiana's counterarguments lack merit.  Indiana points to two unpublished orders, neither of which is apposite.  Br. 64 (first citing *Watkins Law & Advocacy, PLLC v. U.S. Dep't of Veterans Affairs*, No. 19-5341, 2020 WL 3002126, at *1 (D.C. Cir. Mar. 12, 2020) (per curiam) (unpublished); and then citing *Schaerr v. U.S. Dep't of Justice*, No. 20-5065, 2020 WL 5642042, at *1 (D.C. Cir. July 8, 2020) (per curiam) (unpublished)).  Both cited orders rely on *Building Industry Ass'n of Superior California v. Babbitt*, 161 F.3d 740, 742–43 (D.C. Cir. 1998), for the proposition that "where the district court remand[s] to the agency as to some claims and grant[s] summary judgment as to, and certified as final under Rule 54(b), the remaining claims," the fully resolved claims may be appealed.  *Watkins Law*, 2020 WL 3002126, at *1; *accord Schaerr*, 2020 WL 5642042, at *1.  But that posture is not present here, where the district court addressed on a single claim before remanding to the agency.  Rule 54(b) has no role to play here.  Indiana also points to an

26

unreasoned Ninth Circuit opinion. *National Wildlife Fed'n v. National Marine Fisheries Serv.*, 524 F.3d 917, 936 (9th Cir. 2008). That decision offers no explanation for why Rule 54(b) could render final a remand order. In any event, this Court and the Supreme Court have made clear that a court may enter a 54(b) judgment only if it has finally resolved a claim. *See Attias*, 969 F.3d at 417; *Sears*, 351 U.S. at 435. By definition, a remand order is not final.

Indiana fares no better in its arguments for practical finality. *See* Br. 65–69. The State offers arguments that apply to every non-appealable remand of an agency action. Indiana argues that "[t]he judgment leaves nothing more for *the court* to do regarding the vacated 2020 approval." Br. 65 (emphasis added). But the relevant question is whether the judgment leaves anything for *the agency* to do on remand, *American Haw. Cruises*, 893 F.2d at 1403, and here it does: provide a more robust explanation for the demonstration approval, *see* Mem. Op. <Dkt. 68/58>. Indiana complains that post-remand litigation will examine the revised decision, not the original decision. Br. 66. Of course it will; the point of the remand doctrine is to

27

avoid unnecessarily duplicative litigation.[3]  *See Pueblo of Sandia*, 231 F.3d at 880.  Indiana also contends (Br. 66–67) that it will lack a meaningful opportunity to argue that the district court applied the wrong remedy.  But appellate courts "review judgments, not opinions." *Harvey v. District of Columbia*, 798 F.3d 1042, 1056 (D.C. Cir. 2015) (quotation marks omitted).  If Indiana is unhappy with an eventual final judgment in these proceedings, it may appeal from that judgment.  It is not entitled to challenge every interlocutory determination on the way to final judgment. *See Mohawk Indus.*, 558 U.S. at 106.  That general conclusion is even stronger in this case, because the stay entered by the district court effectively provided what Indiana says it wants to seek on appeal: remand without vacatur.  *See* Minute Order, <10/7/24 JA#> (allowing all elements of HIP, except for Indiana's ability to collect premiums, to remain in effect through the conclusion of any remand to the agency).

---

[3] That Indiana may choose to litigate in another judicial district if the Secretary declines on remand to issue a new approval is of no moment.  Such litigation would give Indiana an opportunity for a final judicial resolution of its arguments.  And, in any event, Indiana could choose to litigate before the same district court if it so chose.  *See* 28 U.S.C. § 1391(e)(1) (venue); D.D.C. LCvR 40.5(a)(4), (c)(1) (subsequent case filed in this district would be related before the same district judge).

The other precedents Indiana cites underscore why this order is not final.  Indiana's reliance (at 66) on *Travis v. Sullivan* is misplaced because in that case the federal agency to which the matter had been remanded filed the appeal.  *See* 985 F.2d 919, 920 (7th Cir. 1993).  Unlike Indiana, the federal agency in *Travis* could not have appealed after the remand.  *See Lakes Pilots Ass'n*, 359 F.3d at 624.  Nor can Indiana find refuge in *Limnia, Inc. v. U.S. Department of Energy*, in which the remand order "did not return the 'core dispute' . . . back for further proceedings by the agency."  857 F.3d 379, 386 (D.C. Cir. 2017), *cited in* Br. 67–68.  The same is true for *American Great Lakes Ports Ass'n v. Schultz*, in which the district court did not instruct the agency to "reopen" its challenged decision and "conduct further proceedings" but rather "finally disposed of the [plaintiffs'] APA challenges."  962 F.3d 510, 515 (D.C. Cir. 2020).  Those orders were appealable because they "left nothing for the agency to do on remand," *Pueblo of Sandia*, 231 F.3d at 881.  Here, in contrast, the district court remanded to allow the agency to try to "rehabilitate the approval," Memorandum Opinion,<Dkt. 68/58>.  *Travis*, *Limnia*, and *American Great Lakes Ports* fall into recognized exceptions to the general rule that remand orders may not be appealed, none of which

29

applies here.  Indiana's decontextualized quotations from these doctrinally distinct precedents do not advance its cause.

Finally, Indiana's plea for special solicitude lacks merit.  *See* Br. 69 (citing *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007)).  *Massachusetts v. EPA* does not address finality for purposes of 28 U.S.C. § 1291.  Instead, the Supreme Court's decision gave weight to a State's unique right to sue to protect its quasi-sovereign interests, including its "desire to preserve its sovereign territory" and "'the earth and air within its domain.'" *Massachusetts*, 549 U.S. at 519 (quoting *Georgia v. Tennessee Copper Co.*, 206 U.S. 230, 237 (1907)).  It did not allow States to sidestep jurisdictional requirements.

## II.    The Secretary adequately explained his decision to approve the HIP demonstration.

If the Court nonetheless reaches the merits, it should vacate the judgment.  While the federal government did not appeal from the district court's decision, the court erred in concluding that plaintiffs were entitled to summary judgment.

The district court decided only that the Secretary failed to adequately explain his 2020 decision to approve the demonstration; it expressly declined to reach the reasonableness of the Secretary's decision or to review the 2023

30

letter.  *See* Memorandum Opinion,<Dkt. 68/21>.  Thus, the only issue this Court should address is whether the Secretary adequately explained his 2020 decision.  *See, e.g.*, *Cox v. Kijakazi*, 77 F.4th 983, 997 (D.C. Cir. 2023) (remanding to allow district court to consider APA claims in the first instance); *see also American Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*, 896 F.3d 437, 454 (D.C. Cir. 2018) ("Federal courts of appeals generally are courts of review, not first view." (cleaned up)).  Here, the Secretary provided a sufficient explanation.

## A.    The Secretary's discretionary decision to approve a Section 1115 demonstration is subject to highly deferential review.

Section 1115 authorizes HHS to approve a demonstration project which, "*in the judgment of the Secretary*, is likely to assist in promoting the objectives" of the Medicaid statute, "to the extent and for the period *he finds necessary*."  42 U.S.C. § 1315(a) (emphases added).  This language "exudes deference" to the Secretary's determination.  *Webster v. Doe*, 486 U.S. 592, 600 (1988).  The broad grant of discretion reflects the nature and purpose of demonstration projects.  Section 1115(a) permits "any . . . demonstration project" that the Secretary deems "likely to assist in promoting the objectives of" Medicaid.  42 U.S.C. § 1315(a).  And it authorizes the Secretary

31

to waive compliance with "any . . . requirements" imposed by Section 1396a—which establishes the requirements for a state plan—"to the extent and for the period [the Secretary] finds necessary." *Id.* § 1315(a)(1). The text of Section 1115 makes clear Congress's intent to give the Secretary broad discretion to authorize experiments in this context.

The appropriate degree of deference is greater still because demonstration projects are time-limited experiments that can "influence policy making at the State and Federal level, by testing new approaches that can be models for programmatic changes nationwide or in other States." *Medicaid Program; Review and Approval Process for Section 1115 Demonstrations*, 77 Fed. Reg. 11,678, 11,680 (Feb. 27, 2012). The point of these experiments is to test hypotheses, and either validate a hypothesis that might lead to new innovations or else refute the hypothesis and help Congress and HHS avoid mistaken policies in the future. The costs of trying out new approaches in state-level experiments are vastly lower than the alternative of testing out new provisions nationwide through statutory or regulatory amendments, and even unsuccessful experiments can provide useful information. *See, e.g.*, *C.K. v. New Jersey Dep't of Health & Human Servs.*, 92 F.3d 171, 187 (3d Cir. 1996) (explaining that Section 1115

32

"experiments are supposed to demonstrate the failings or success of such programs").

In approving these experiments, the Secretary does not know in advance whether they will succeed and is not required to have substantial evidence that they will attain their goals. Rather, a central purpose of a demonstration project is to demonstrate the extent to which its approach will, in fact, further its goals. As the Second Circuit explained in *Aguayo v. Richardson*, 473 F.2d 1090, 1103 (2d Cir. 1973) (Friendly, C.J.)—which upheld a demonstration project that established work requirements for another welfare program covered by Section 1115—"it is legitimate for an administrator to set a lower threshold for persuasion when he is asked to approve a program that is avowedly experimental and has a fixed termination date."

Consistent with the broad grant of discretion and the nature of a demonstration project, Section 1115 does not require that HHS provide an explanation for its decisions. Nor does the APA: a demonstration project is not the product of rulemaking, and it "does not involve 'adjudication required by statute to be determined on the record after opportunity for an agency hearing,' 5 U.S.C. § 554(a), to which alone the [APA's] requirement of

33

findings, 5 U.S.C. § 557(c), applies." *Aguayo*, 473 F.2d at 1107. Instead, the ACA required the Secretary to promulgate regulations to create "a process for providing public notice and comment after the application is received by the Secretary, that is sufficient to ensure a meaningful level of public input." 42 U.S.C. § 1315(d)(2)(C). The resulting regulations indicate that HHS "will review and consider all comments received by the deadline[ ] but will not provide written responses to public comments." 42 C.F.R. § 431.416(d)(2). Plaintiffs have not challenged those regulations.

The purpose of the approval letters is not to facilitate judicial review, which, as the terms of the statute make clear, is extremely limited. Section 1115 authorizes HHS to approve a demonstration that, "in the judgment of the Secretary, is likely to assist in promoting the objectives" of the Medicaid program and to "waive compliance with any of the requirements" of 42 U.S.C. § 1396a "to the extent and for the period he finds necessary to enable such State or States to carry out" the project, 42 U.S.C. § 1315(a). That conclusion is reinforced by the nature of the administrative action at issue, which is a time-limited experiment intended to inform future policy. Section 1115 thus does not direct the Secretary to determine whether an

34

experiment "will promote" the Medicaid program's objectives, but only whether it is "likely to assist" in doing so.

When reviewing HHS's determination that a demonstration project is "likely to assist" in promoting program objectives, a court's application of the "[t]he 'arbitrary and capricious' standard is particularly deferential" as it is in all "matters implicating predictive judgments." *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009).  Likewise, "predictive judgments about areas that are within the agency's field of discretion and expertise" are entitled to "particularly deferential" treatment.  *International Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 821 (D.C. Cir. 1983); *see FCC v. National Citizens Comm. for Broad.*, 436 U.S. 775, 813 (1978).  And that maxim is especially true when, as in Section 1115, the statute offers no standards by which to measure the reasonableness of the agency's judgment.  *See, e.g.*, *Schieber v. United States*, 77 F.4th 806, 813–14 (D.C. Cir. 2023), *cert. denied*, 144 S. Ct. 688 (2024).

> **B.    The Secretary appropriately considered and addressed all relevant factors in approving Indiana's application.**

1. As explained, neither Section 1115 nor the APA requires the Secretary to explain his decisions.  *Aguayo*, 473 F.2d at 1107.  Accordingly, the unchallenged regulations that implement Section 1115 indicate that the

35

agency "will review and consider all comments received by the deadline[ ] but will not provide written responses to public comments." 42 C.F.R. § 431.416(d)(2). Even if, however, the Secretary was required to offer an explanation or to respond to comments, he met that obligation.

a. The Secretary specifically determined that HIP was likely to assist in promoting coverage. Citing the substance use disorder and serious mental illness components of HIP, the Secretary explained that those elements would improve "access to high-quality services" and "expand[ ] covered services" that would "otherwise be excluded from federal reimbursement." Demonstration Approval, <SAR 1561>. The Secretary also determined that the HIP project would create "incentives for individuals to enroll as soon as possible and to obtain preventive services," "enable states to expand or maintain coverage for needy individuals," and provide certain beneficiaries with "an enriched benefit package." *Id.*, <SAR 1556, 1561, 1563–64>.

In a related fashion, the Secretary explained why HIP would improve the fiscal sustainability of Indiana's social safety net. He found that it would enable "the state to better contain Medicaid costs and more efficiently focus resources on providing accessible and high-quality health coverage" and "provide services to Medicaid beneficiaries that it could not otherwise

36

provide." Demonstration Approval, <SAR 1561–62>. Those savings, the Secretary predicted, would make "it more viable for states to furnish medical assistance to a broader range of persons in need" or provide "additional [non-mandatory] benefits to existing beneficiaries," *id.*, <SAR 1556>, as Indiana did in HIP Plus with dental and vision plans, *id.*, <SAR 1561–62>. The Secretary also noted that permitting Indiana not to cover non-emergency medical transportation was "expected to improve the fiscal sustainability of the state's safety net and contribute to the provision of additional services offered through HIP." *Id.*, <SAR 1572>.

Finding methods to more efficiently allocate scarce resources is a key feature of many Section 1115 demonstration projects. The Supreme Court has long recognized that requirements that enable States to stretch limited resources promote the objectives of public welfare programs. In upholding state work requirements in the context of the Aid to Families with Dependent Children program, the Supreme Court emphasized that States may "attempt to promote self-reliance and civic responsibility" in order "to assure that limited state welfare funds be spent on behalf of those genuinely incapacitated and most in need, and to cope with the fiscal hardships enveloping many state and local governments." *New York State Dep't of Soc.*

37

*Servs. v. Dublino*, 413 U.S. 405, 413 (1973).  The Supreme Court reaffirmed that principle in the context of Medicaid, when it upheld drug-rebate and prior-authorization requirements that were designed to keep borderline populations out of Medicaid.  *See Pharmaceutical Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 663, 666–67 (2003) (plurality opinion) (quoting the same language from *Dublino*); *see also id.* at 689 (O'Connor, J., joined by Rehnquist, C.J., and Kennedy, J., concurring in part and dissenting in part) (agreeing that Medicaid's purposes would be served by requirements intended to keep borderline populations from becoming Medicaid-eligible).

This Court upheld a similar state program in *Pharmaceutical Research & Manufacturers of America v. Thompson*, 362 F.3d 817 (D.C. Cir. 2004), explaining that if the program "prevents borderline populations in [n]on–Medicaid programs from being displaced into a state's Medicaid program, more resources will be available for existing Medicaid beneficiaries."  *Id.* at 825.  And longstanding agency practice further supports the idea that the Secretary may properly approve demonstration projects to test measures that could indirectly enhance States' ability to provide coverage, including by conserving resources.  *See* Kaiser Comm'n on Medicaid & the Uninsured, *A Look at Section 1115 Medicaid Demonstration Waivers Under the ACA: A*

*Focus on Childless Adults* 4 (Oct. 2013), https://perma.cc/RT2T-SVUM (explaining that before the ACA, States could only expand Medicaid to childless adults by generating savings through a demonstration project).

Both the direct expansion of treatment options for substance use disorder and for serious mental illness and the reallocation of scarce resources support the Secretary's determination that the demonstration will promote the purposes of Medicaid.

b.  The Secretary considered the possibility that the demonstration would decrease coverage and balanced that possibility against the benefits he expected from the HIP demonstration.  That consideration satisfies any procedural requirements the APA imposes.

The Secretary recognized that allowing Indiana to charge premiums for HIP Plus could result in disenrollment.  Demonstration Approval, <SAR 1563, 1570>.  The Secretary explained that charging premiums would give Hoosiers with incomes below the federal poverty limit a choice between paying premiums to obtain expanded benefits and not paying premiums to obtain the mandatory benefits covered by Medicaid (other than non-emergency medical transportation and retroactive coverage).  *See id.,* <SAR 1563>.  He acknowledged that some people might not pay premiums

39

and thus lose their HIP Plus benefits. *See id.,* <SAR 1570>. Nevertheless, the Secretary noted that data indicate that "the number and proportion of individuals disenrolled due to non-payment decreased over time" and his approval necessary establishes that that he considered any potential coverage losses would be more than offset by HIP's substantial benefits. *See id.*, <SAR 1570>; *see also* HIP Interim Evaluation Report, <SAR 4755> ("The disenrollment rate decreased from an average of 3.1% in 2016 to an average of 2.2% in 2018 . . . ." (citations omitted)). Plaintiffs' disagreement with the Secretary's interpretation of the data and with his policy judgment to approve the demonstration does not provide a basis for challenging his discretionary decision.

The Secretary similarly explained that he believed restricting non-emergency medical transportation would not result in decreased coverage. The Secretary pointed to record evidence that the availability of non-emergency medical transportation made no statistically significant difference in whether beneficiaries missed appointments. Demonstration Approval, <SAR 1562>; *see* Lewin Grp., Inc., *Indiana HIP 2.0: Evaluation of Non-Emergency Medical Transportation (NEMT) Waiver* (Nov. 2, 2016), <SAR 6049>. Because "evaluation findings for this policy did not indicate evidence

of adverse effects on beneficiaries" and because the policy improved the "sustainability of the state's safety net," the Secretary concluded that the costs of offering all beneficiaries non-emergency medical transportation outweighed the limited benefits of providing the service. Demonstration Approval, <SAR 1572>.

Finally, the Secretary explained why waiving retroactive coverage would not result in decreased coverage. The Secretary stated that he "expected" the waiver of retroactive coverage "to help promote Medicaid's objectives by improving [the] uptake of preventive services." Demonstration Approval, <SAR 1564>. He also explained that Indiana was "testing whether waiving retroactive eligibility for certain groups of Medicaid beneficiaries will encourage them to obtain and maintain health coverage, even when healthy, or to obtain health coverage as soon as possible after becoming eligible, rather than potentially waiting until they are sick." *Id.*, <SAR 1564>; *see id.*, <SAR 1571–72>. Against these potential benefits as well as the optional benefits beneficiaries would obtain through the HIP Plus program, the Secretary considered and balanced the potential for loss of coverage. *Id.*, <SAR 1563–64, 1571–72>. Specifically, he pointed to the fact that Indiana's existing retroactive eligibility program "was not widely used

41

by beneficiaries." *Id.*, <SAR 1564–65, 1564 n.9>.  The Secretary was entitled to make the policy choice to accept these limited risks in exchange for significant predicted benefits.

     c.  The experimental nature of Section 1115 demonstrations underscores why the Secretary sufficiently explained his decision to approve this one.  A Section 1115 demonstration allows a State to test a hypothesis.  *See* 77 Fed. Reg. at 11,679–80.  The policy may meet the State's goals; it may fail.  *Id.* at 11,679; *accord C.K.*, 92 F.3d at 187.  Either way, the experiment succeeds when the Secretary and the State both get valuable information about potential policy innovations.  A high-confidence explanation that addresses every possible downside and points clearly to a socially optimal policy prescription is the best-case *outcome* from a Section 1115 demonstration project.  To expect that kind of explanation at the *outset*—as the district court did—will inevitably lead to disappointment.  It's not just impossible; it's inimical to the idea of experimentation.  *See generally* Karl Popper, *The Logic of Scientific Discovery* (1959) (the scientific method demands falsifiable hypotheses).  The district court erred in requiring the Secretary to demonstrate that the experiment will produce a positive outcome.

42

2. The Secretary also explained why the demonstration was likely to advance other purposes of Medicaid.

a. A core objective of Medicaid is expanding access to health care. 42 U.S.C. § 1396-1; *see Harris v. McRae*, 448 U.S. 297, 301 (1980). But that is not the statute's sole objective.[4] A Section 1115 demonstration may also aim to improve beneficiary health outcomes. That proposition may seem self-evident. *But see* Memorandum Opinion, <Dkt. 68/49–50>. After all, Congress enacted Medicaid for the purpose of helping beneficiaries—low-income people who tend to suffer disproportionately from poor health—live healthier lives.

Statutory context supports the notion that a major purpose of Medicaid is improving health. Congress provided, for instance, a permanent appropriation of funds not just for furnishing "medical assistance" but also for furnishing "rehabilitation and other services to help [beneficiaries] attain or retain capability for independence or self-care." 42 U.S.C. § 1396-1. The

---

[4] A panel of this Court rejected this argument in *Gresham v. Azar*, 950 F.3d 93 (D.C. Cir. 2020), *vacated sub nom. Arkansas v. Gresham*, 142 S. Ct. 1665 (2022). The Supreme Court, however, vacated that judgment as moot. When the Supreme Court vacates a court of appeals decision because mootness prevented appellate review, the vacated decision does not bind future panels. *See U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 26 (1994).

second clause points to a broader purpose animating the program: improving recipients' quality of life.  That is why Congress authorized States to administer Medicaid flexibly so long as they act in "the best interests of the recipients."  *Id.* § 1396a(a)(19).  Similarly, the ACA authorized grants for States that give Medicaid recipients incentives for various "healthy behaviors," including "[c]easing use of tobacco products," "[c]ontrolling or reducing their weight," "[l]owering their cholesterol," or "[a]voiding the onset of diabetes[,] or, in the case of a diabetic, improving the management of that condition."  ACA § 4108, 124 Stat. at 561–63 (codified at 42 U.S.C. § 1396a note).

Indeed, one of Congress's major objectives in creating Medicaid was improving Americans' health outcomes.  When he asked Congress to enact the Social Security Amendments of 1965, President Johnson stressed that it was "imperative that we give first attention to our opportunities—and our obligations—for advancing the Nation's health.  For the health of our people is, inescapably, the foundation for fulfillment of all our aspirations."  H.R. Doc. No. 89-44, at 1 (1965).  In reporting the bill, both of the Congressional committees with responsibility for drafting it noted that "[s]tandards of care" for low-income Americans were unsatisfactory and that they expected

Medicaid to "to bring about progressive improvement in the level of institutional care and services provided" to beneficiaries. H.R. Rep. No. 89-213, at 66 (1965) (House Ways and Means Committee); *accord* S. Rep. No. 89-404, at 84 (1965) (Senate Finance Committee). In floor debate, members argued that the bill "represent[ed] a most vital matter—vital in the literal sense of longer, healthier lives—for every American," 111 Cong. Rec. 7364 (1965) (statement of Rep. Sullivan), and that passing it would "build a healthier and happier America," *id.* at 7430 (statement of Rep. Gray). Congress thus made clear that it intended for Medicaid to lead to better health outcomes.

Finally, even if this Court declines to recognize that improving beneficiary health is a standalone objective of Medicaid, healthier beneficiaries generally require less care, which improves the sustainability of the safety net.

b. The Secretary explained that the HIP demonstration is likely to "furnish medical assistance in a manner that improves the sustainability of the safety net." Demonstration Approval, <SAR 1561>. The Secretary noted that HIP should incentivize beneficiaries "to enroll as soon as possible and to obtain preventive services and assess health risk" and explained that

45

such steps would potentially reduce costs by lessening "the incidence of chronic or preventable conditions[ ] and by helping to ensure chronic conditions are well managed." *Id.*, <SAR 1561>.  He predicted that exempting the State from providing non-emergency medical transportation would allow it "to better contain Medicaid costs and more efficiently focus resources." *Id.*, <SAR 1561>.  And he concluded that "[i]mproved fiscal sustainability will help Indiana to continue to cover non-mandatory benefits and eligibility groups (such as the [ACA] expansion population and dental and vision benefits)." *Id.*, <SAR 1562>.  Contrary to the district court's holding, nothing in the APA or Section 1115 requires the Secretary to quantify the exact value of those savings.  *See FCC v. Prometheus Radio Project*, 592 U.S. 414, 427 (2021).  Rather, these findings suffice to demonstrate that the HIP demonstration is likely to advance the objectives of Medicaid.

The Secretary also explained that the HIP demonstration will "test[ ] reforms designed to promote financial independence, which [he] expect[ed] to improve continuity of coverage and lead to better health outcomes." Demonstration Approval, <SAR 1563>.  The Secretary stated that the "premiums and cost-sharing requirements are designed to improve

beneficiary health and wellness by encouraging beneficiaries to take ownership of decisions about health care options." *Id.*, <SAR 1563>.  He explained that through the demonstration project, Indiana would test "whether the consumer-driven approach indeed helps drive more conscious health behaviors and service utilization." *Id.*, <SAR 1564>.  If it does, then the HIP demonstration may provide a model for promoting beneficiary health, which would allow States to redirect scarce Medicaid funds to other benefits or populations.  Similarly, the Secretary explained that the demonstration project will "test[ ] whether waiving retroactive eligibility for certain groups of Medicaid beneficiaries will encourage them to obtain and maintain health coverage, even when healthy, or to obtain health coverage as soon as possible after becoming eligible, rather than potentially waiting until they are sick, knowing that the costs of the illness would be covered by a retroactive eligibility period." *Id.*, <SAR 1564>.  Again, if that hypothesis is borne out, States would be able to encourage their populations to be healthier and cheaper to insure.

Each of these objectives provides additional support for the Secretary's determination.  The district court erred in in discounting them. *See* Memorandum Opinion, <Dkt. 68/49–56.

47

3.  To the extent the district court's decision requires the Secretary to respond to public comments, *see* Memorandum Opinion, <Dkt. 68/33, 35–41, 48, 50–51, 54>, it violates the fundamental principle that courts may not impose on agencies "procedures beyond those required by . . . statute." *See Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 524 (1978); *see also Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654–55 (1990) (applying *Vermont Yankee* to informal adjudication).  Nothing in Section 1115 or the APA requires the Secretary to address comments.  *See Aguayo*, 473 F.2d at 1107.  Thus, at most, the Secretary "is only obliged to provide an explanation adequate to give a reviewing court a basic understanding—and not a very detailed one—of [his] action." *Hudson v. FAA*, 192 F.3d 1031, 1036 (D.C. Cir. 1999).  The Secretary met that obligation.

The district court, however, seemingly applied the APA standard for reviewing an agency's explanation for a notice-and comment rule.  *See, e.g.*, Memorandum Opinion, <Dkt. 68/36> (citing *Humane Soc'y of the U.S. v. Zinke*, 865 F.3d 585, 606 (D.C. Cir. 2017)); *see also Humane Soc'y*, 865 F.3d at 606 (holding that agency failed to adequately explain rulemaking).  It faulted the Secretary for failing to explain why he disagreed with

commenters' competing assessments of data, Memorandum Opinion, <Dkt. 68/36>, for failing to engage with commenters' "assert[ion] . . . [of] confounding factors," *id.*, <Dkt. 68/37>, and for failing to "tackl[e]" commenters' concerns about reduced coverage, *id.*, <Dkt. 68/39>. Indeed, most of the district court's objections to the Secretary's approval decision are that he did not adequately respond to comments. Plaintiffs might be able to advance a colorable argument that such detailed responses to comments would be required for a rulemaking. *But see Reytblatt v. U.S. Nuclear Regulatory Comm'n*, 105 F.3d 715, 722 (D.C. Cir. 1997) (agency need only respond in reasoned and context-sensitive way to comments raising significant problems). There is, however, no basis for requiring the Secretary to document his reaction to every comment in an informal adjudication of a request to approve Section 1115 demonstration.

**C.    The district court erred in failing to consider the Secretary's approval of Indiana's demonstration as a whole.**

The district court also construed the scope of the demonstration project too narrowly. Section 1115 defines the "project" as the unit of analysis—not individual components. 42 U.S.C. § 1315(a). For that reason,

the Secretary looks to the demonstration as a whole when determining whether the project is likely to advance Medicaid's purposes.

The Secretary made clear in his approval that the substance use disorder program and the serious mental illness program were part and parcel of HIP. Demonstration Approval, <SAR 1560> (explaining that "[t]he HIP demonstration also includes a [substance use disorder] program"); *id.*, <SAR 1560> (explaining that there is a "[serious mental illness] component of the HIP demonstration"); *accord id.*, <SAR 1557–58, 1560, 1573> (analyzing substance use and mental-health elements as part of HIP demonstration project). Thus, when the Secretary explained his decision, he looked, in part, to these substance use and mental health benefits. *See supra* pp. 35–39. The Secretary's approach dovetailed with the way Indiana treated its own application. *See, e.g.*, Extension Request, <SAR 8279, 8281> (simultaneously seeking public comment the substance use and serious mental health changes and on extension of the other elements).

Despite recognizing that the agency had treated the HIP project as an indivisible whole, *see* Memorandum Opinion, <Dkt. 68/29>, the district court gerrymandered the scope of HIP to exclude the substance use and mental health components of the project, thereby rendering irrelevant much of the

50

Secretary's explanation for his decision, *see id.*, <Dkt. 68/30–32>.[5]  The

district court erred in assuming that different elements of the project were in

fact separate projects because the Secretary approved them for different

groups and durations, *see id.*, <Dkt. 68/30–32>, but the statute does not

require such uniformity.  This error explains much of the district court's

decision.  For instance, the district court concluded that the Secretary failed

to explain how the demonstration would promote coverage.  *Id.*, <Dkt.

68/40–48>.  But it was able to reach that conclusion only by ignoring the

Secretary's consideration of the benefits of increased access to treatment for

substance use disorder and serious mental illness.  *Compare id.*, <Dkt.

68/40–48>, *with* Demonstration Approval, <SAR 1560–61> (discussing

expanded coverage for serious mental illness and substance use disorder).

Had the district court taken into account the entire demonstration, it would

have found sufficient explanation to reject plaintiffs' claims.  *See supra* pp.

35–39.  Moreover, because the district court failed to consider the Secretary's

---

[5] The district court also asserted that the agency "d[id] not contest
before this Court that the projects are separate."  Memorandum Opinion,
<Dkt. 68/31>.  That is incorrect.  The agency's filings in district court made
clear that the "substance use disorder and serious mental illness" programs
were "components of HIP."  HHS Summary Judgment Br., <Dkt. 55/30>.

approval of the HIP demonstration holistically, its judgment should be vacated.

## CONCLUSION

For the foregoing reasons, this appeal should be dismissed for lack of jurisdiction.  In the alternative, the district court's judgment should be vacated and this case remanded for further proceedings.

Respectfully submitted,

*Of Counsel:*

SEAN R. KEVENEY
   *Acting General Counsel*

LENA YUEH
   *Acting Associate General Counsel*

DAVID L. HOSKINS
   *Deputy Associate General Counsel*
     *for Litigation*

GARRETT F. MANNCHEN
   *Attorney*

   *U.S. Department of Health and*
     *Human Services*

April 2025

YAAKOV M. ROTH
   *Acting Assistant*
     *Attorney General*

MICHAEL S. RAAB

/s/ Maxwell A. Baldi
MAXWELL A. BALDI
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7513*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 532-0211*
   *maxwell.baldi@usdoj.gov*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,310 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Expanded BT 14-point font, a proportionally spaced typeface.

/s/ *Maxwell A. Baldi*
Maxwell A. Baldi

**ADDENDUM**

# TABLE OF CONTENTS

42 U.S.C. § 1315 ............................................................................A1

42 C.F.R. § 431.416 ......................................................................A8

**42 U.S.C. § 1315.**

**§ 1315.  Demonstration Projects**

**(a) Waiver of State plan requirements; costs regarded as State plan expenditures; availability of appropriations**

In the case of any experimental, pilot, or demonstration project which, in the judgment of the Secretary, is likely to assist in promoting the objectives of subchapter I, X, XIV, XVI, or XIX, or part A or D of subchapter IV, in a State or States—

(1) the Secretary may waive compliance with any of the requirements of section 302, 602, 654, 1202, 1352, 1382, or 1396a of this title, as the case may be, to the extent and for the period he finds necessary to enable such State or States to carry out such project, and

(2)

(A) costs of such project which would not otherwise be included as expenditures under section 303, 655, 1203, 1353, 1383, or 1396b of this title, as the case may be, and which are not included as part of the costs of projects under section 1310 of this title, shall, to the extent and for the period prescribed by the Secretary, be regarded as expenditures under the State plan or plans approved under such subchapter, or for administration of such State plan or plans, as may be appropriate, and

(B) costs of such project which would not otherwise be a permissible use of funds under part A of subchapter IV and which are not included as part of the costs of projects under section 1310 of this title, shall to the extent and for the period prescribed by the Secretary, be regarded as a permissible use of funds under such part.

In addition, not to exceed $4,000,000 of the aggregate amount appropriated for payments to States under such subchapters for any fiscal year beginning after June 30, 1967, shall be available, under such terms and conditions as the Secretary may establish, for payments to States to cover so much of the cost of such projects as is not covered by payments under such subchapters and is not included as part of the cost of projects for purposes of section 1310 of this title.

**(b) Child support enforcement programs**

(1) In the case of any experimental, pilot, or demonstration project undertaken under subsection (a) to assist in promoting the objectives of part D of subchapter IV, the project—

(A) must be designed to improve the financial well-being of children or otherwise improve the operation of the child support program;

(B) may not permit modifications in the child support program which would have the effect of disadvantaging children in need of support; and

(C) must not result in increased cost to the Federal Government under part A of such subchapter.

(2) An Indian tribe or tribal organization operating a program under section 655(f) of this title shall be considered a State for purposes of authority to conduct an experimental, pilot, or demonstration project under subsection (a) to assist in promoting the objectives of part D of subchapter IV and receiving payments under the second sentence of that subsection. The Secretary may waive compliance with any requirements of section 655(f) of this title or regulations promulgated under that section to the extent and for the period the Secretary finds necessary for an Indian tribe or tribal organization to carry out such project. Costs of the project which would not otherwise be included as expenditures of a program operating under section 655(f) of this title and which are not included as part of the costs of projects under section 1310 of this title, shall, to the extent and for the period prescribed by the Secretary, be regarded as expenditures under a tribal plan or plans approved under such section, or for the administration of such tribal plan or plans, as may be appropriate. An Indian tribe or tribal organization applying for or receiving start-up program development funding pursuant to section 309.16 of title 45, Code of Federal Regulations, shall not be considered to be an Indian tribe or tribal organization operating a program under section 655(f) of this title for purposes of this paragraph.

A2

**(c) Demonstration projects to test alternative definitions of unemployment**

(1)

(A) The Secretary shall enter into agreements with up to 8 States submitting applications under this subsection for the purpose of conducting demonstration projects in such States to test and evaluate the use, with respect to individuals who received aid under part A of subchapter IV in the preceding month (on the basis of the unemployment of the parent who is the principal earner), of a number greater than 100 for the number of hours per month that such individuals may work and still be considered to be unemployed for purposes of section 607 of this title.  If any State submits an application under this subsection for the purpose of conducting a demonstration project to test and evaluate the total elimination of the 100-hour rule, the Secretary shall approve at least one such application.

(B) If any State with an agreement under this subsection so requests, the demonstration project conducted pursuant to such agreement may test and evaluate the complete elimination of the 100-hour rule and of any other durational standard that might be applied in defining unemployment for purposes of determining eligibility under section 607 of this title.

(2) Notwithstanding section 602(a)(1) of this title, a demonstration project conducted under this subsection may be conducted in one or more political subdivisions of the State.

(3) An agreement under this subsection shall be entered into between the Secretary and the State agency designated under section 602(a)(3) of this title.  Such agreement shall provide for the payment of aid under the applicable State plan under part A of subchapter IV as though section 607 of this title had been modified to reflect the definition of unemployment used in the demonstration project but shall also provide that such project shall otherwise be carried out in accordance with all of the requirements and conditions of section 607 of this title (and, except as provided in paragraph (2), any related requirements and conditions under part A of subchapter IV).

(4) A demonstration project under this subsection may be commenced any time after September 30, 1990, and shall be conducted for such period of time as the agreement with the Secretary may provide; except that, in no event may a demonstration project under this section be conducted after September 30, 1995.

(5)

(A) Any State with an agreement under this subsection shall evaluate the comparative cost and employment effects of the use of the definition of unemployment in its demonstration project under this section by use of experimental and control groups comprised of a random sample of individuals receiving aid under section 607 of this title and shall furnish the Secretary with such information as the Secretary determines to be necessary to evaluate the results of the project conducted by the State.

(B) The Secretary shall report the results of the demonstration projects conducted under this subsection to the Congress not later than 6 months after all such projects are completed.

## (d) Regulations relating to applications for or renewals of demonstration projects

(1) An application or renewal of any experimental, pilot, or demonstration project undertaken under subsection (a) to promote the objectives of subchapter XIX or XXI in a State that would result in an impact on eligibility, enrollment, benefits, cost-sharing, or financing with respect to a State program under subchapter XIX or XXI (in this subsection referred to as a "demonstration project") shall be considered by the Secretary in accordance with the regulations required to be promulgated under paragraph (2).

(2) Not later than 180 days after March 23, 2010, the Secretary shall promulgate regulations relating to applications for, and renewals of, a demonstration project that provide for—

(A) a process for public notice and comment at the State level, including public hearings, sufficient to ensure a meaningful level of public input; (B) requirements relating to—

(i) the goals of the program to be implemented or renewed under the demonstration project;

(ii) the expected State and Federal costs and coverage projections of the demonstration project; and

(iii) the specific plans of the State to ensure that the demonstration project will be in compliance with subchapter XIX or XXI;

(C) a process for providing public notice and comment after the application is received by the Secretary, that is sufficient to ensure a meaningful level of public input;

(D) a process for the submission to the Secretary of periodic reports by the State concerning the implementation of the demonstration project; and

(E) a process for the periodic evaluation by the Secretary of the demonstration project.

(3) The Secretary shall annually report to Congress concerning actions taken by the Secretary with respect to applications for demonstration projects under this section.

## (e) Extensions of State-wide comprehensive demonstration projects for which waivers granted

(1) The provisions of this subsection shall apply to the extension of any State-wide comprehensive demonstration project (in this subsection referred to as "waiver project") for which a waiver of compliance with requirements of subchapter XIX is granted under subsection (a).

(2) During the 6-month period ending 1 year before the date the waiver under subsection (a) with respect to a waiver project would otherwise expire, the chief executive officer of the State which is operating the project may submit to the Secretary a written request for an extension, of up to 3 years (5 years, in the case of a waiver described in section 1396n(h)(2) of this title), of the project.

(3) If the Secretary fails to respond to the request within 6 months after the date it is submitted, the request is deemed to have been granted.

(4) If such a request is granted, the deadline for submittal of a final report under the waiver project is deemed to have been extended until the date that is 1 year after the date the waiver project would otherwise have expired.

(5) The Secretary shall release an evaluation of each such project not later than 1 year after the date of receipt of the final report.

(6) Subject to paragraphs (4) and (7), the extension of a waiver project under this subsection shall be on the same terms and conditions (including applicable terms and conditions relating to quality and access of services, budget neutrality, data and reporting requirements, and special population protections) that applied to the project before its extension under this subsection.

(7) If an original condition of approval of a waiver project was that Federal expenditures under the project not exceed the Federal expenditures that would otherwise have been made, the Secretary shall take such steps as may be necessary to ensure that, in the extension of the project under this subsection, such condition continues to be met. In applying the previous sentence, the Secretary shall take into account the Secretary's best estimate of rates of change in expenditures at the time of the extension.

**(f) Application for extension of waiver project; submission; approval**

An application by the chief executive officer of a State for an extension of a waiver project the State is operating under an extension under subsection (e) (in this subsection referred to as the "waiver project") shall be submitted and approved or disapproved in accordance with the following:

(1) The application for an extension of the waiver project shall be submitted to the Secretary at least 120 days prior to the expiration of the current period of the waiver project.

(2) Not later than 45 days after the date such application is received by the Secretary, the Secretary shall notify the State if the Secretary intends to review the terms and conditions of the waiver project. A failure to provide such notification shall be deemed to be an approval of the application.

(3) Not later than 45 days after the date a notification is made in accordance with paragraph (2), the Secretary shall inform the State of proposed changes in the terms and conditions of the waiver project. A failure to provide such information shall be deemed to be an approval of the application.

A6

(4) During the 30-day period that begins on the date information described in paragraph (3) is provided to a State, the Secretary shall negotiate revised terms and conditions of the waiver project with the State.

(5)

    (A) Not later than 120 days after the date an application for an extension of the waiver project is submitted to the Secretary (or such later date agreed to by the chief executive officer of the State), the Secretary shall—

        (i) approve the application subject to such modifications in the terms and conditions—

            (I) as have been agreed to by the Secretary and the State; or

            (II) in the absence of such agreement, as are determined by the Secretary to be reasonable, consistent with the overall objectives of the waiver project, and not in violation of applicable law; or

        (ii) disapprove the application.

    (B) A failure by the Secretary to approve or disapprove an application submitted under this subsection in accordance with the requirements of subparagraph (A) shall be deemed to be an approval of the application subject to such modifications in the terms and conditions as have been agreed to (if any) by the Secretary and the State.

(6) An approval of an application for an extension of a waiver project under this subsection shall be for a period not to exceed 3 years (5 years, in the case of a waiver described in section 1396n(h)(2) of this title).

(7) An extension of a waiver project under this subsection shall be subject to the final reporting and evaluation requirements of paragraphs (4) and (5) of subsection (e) (taking into account the extension under this subsection with respect to any timing requirements imposed under those paragraphs).

**42 C.F.R. § 431.416**

**§ 431.416.  Federal public notice and approval process.**

**(a) General.**  Within 15 days of receipt of a complete application from the State for a new demonstration project or an extension of a previously approved demonstration project, CMS will:

(1) Send the State a written notice informing the State of receipt of the demonstration application, the date in which the Secretary received the State's demonstration application, the start dates of the 30-day Federal public notice process, and the end date of the 45-day minimum Federal decision-making period.

(2) Publish the written notice acknowledging receipt of the State's completed application on its Web site within the same 15-day timeframe.

**(b) Public comment period.**  Upon notifying a State of a completed application, CMS will solicit public comment regarding such demonstration application for 30 days by doing the following:

(1) Publishing the following on the CMS Web site:

(i) The written notice of CMS receipt of the State's complete demonstration application.

(ii) Demonstration applications, including supporting information submitted by the State as part of the complete application, and associated concept papers, as applicable.

(iii) The proposed effective date of the demonstration.

(iv) Addresses to which inquiries and comments from the public may be directed to CMS by mail or email.

(2) Notifying interested parties through a mechanism, such an electronic mailing list, that CMS will create for this purpose.

**(c) Public disclosure.**  CMS will publish on its Web site, at regular intervals, appropriate information, which may include, but is not limited to the following:

(1) Relevant status update(s);

(2) A listing of the issues raised through the public notice process.

A8

**(d) Publishing of comments.**

(1) CMS will publish written comments electronically through its Web site or an alternative Web site.

(2) CMS will review and consider all comments received by the deadline, but will not provide written responses to public comments. While comments may be submitted after the deadline, CMS cannot assure that these comments will be considered.

**(e) Approval of a demonstration application.**

(1) CMS will not render a final decision on a demonstration application until at least 45 days after notice of receipt of a completed application, to receive and consider public comments.

(2) CMS may expedite this process under the exception to the normal public notice process provisions in § 431.416(g) of this subpart.

**(f) Administrative record.**

(1) CMS will maintain, and publish on its public Web site, an administrative record that may include, but is not limited to the following:

(i) The demonstration application from the State.

(ii) The State's disaster exemption request and CMS' response, if applicable.

iii) Written public comments sent to the CMS and any CMS responses.

(iv) If an application is approved, the final special terms and conditions, waivers, expenditure authorities, and award letter sent to the State.

(v) If an application is denied, the disapproval letter sent to the State.

(vi) The State acceptance letter, as applicable.

(vii) Specific requirements related to the approved and agreed upon terms and conditions, such as implementation reviews, evaluation design, quarterly progress reports, annual reports, and interim and/or final evaluation reports.

(viii) Notice of the demonstration's suspension or termination, if applicable.

A9

(2) To ensure that the public has access to all documentation related to the demonstration project, including the aforementioned items, we will also provide a link to the State's public Web site.

**(g) Exemption from the normal public notice process.**

(1) CMS may waive, in whole or in part, the Federal and State public notice procedures to expedite a decision on a proposed demonstration or demonstration extension request that addresses a natural disaster, public health emergency, or other sudden emergency threats to human lives.

(2) The Secretary may exempt a State from the normal public notice process or the required time constraints imposed in this section or § 431.408(a) of this subpart when the State demonstrates to CMS the existence of unforeseen circumstances resulting from a natural disaster, public health emergency, or other sudden emergency that directly threatens human lives that warrant an exception to the normal public notice process.

(i) The State is expected to discharge its basic responsibilities in submitting demonstration applications to the Secretary as required in § 431.412 of this subpart.

(ii) Such applications will be posted on the CMS Web site.

(3) A State must establish (or meet) all of the following criteria to obtain such an exemption from the normal public notice process requirements:

(i) The State acted in good faith, and in a diligent, timely, and prudent manner.

(ii) The circumstances constitute an emergency and could not have been reasonably foreseen.

(iii) Delay would undermine or compromise the purpose of the demonstration and be contrary to the interests of beneficiaries.

(4) CMS will publish on its Web site any disaster exemption determinations within 15 days of approval, as well as the revised timeline for public comment or post-award processes, if applicable.